## UNITED STATES v. COACHELLA VALLEY COUNTY WATER DIST.

No. 14047.

United States District Court
S. D. California, Central Division.

March 11, 1953.

Walter S. Binns, U. S. Atty., Los Angeles, Cal., Irl D. Brett, Sp. Asst. to the Atty. Gen., for plaintiff.

Earl Redwine, Riverside, Cal., for defendant.

WESTOVER, District Judge.

Water and water problems have caused much litigation in western United States. In desert regions he who owns the water or the water rights, in reality owns the land, as desert land without water is relatively worthless; whereas such land with an adequate water supply becomes extremely valuable.

The Colorado River is one of the great rivers of North America. The rain and snowfall of the Rocky Mountain States south of the Snake and Columbia Rivers drain into the ocean by way of the Colorado. After the snows of winter and the early spring thaws, waters from the high mountains rush down to the Colorado, and as a result the valley lands along the lower Colorado have, through the ages, been subjected to spring floods.

Prior to the coming of the white man, spring floods in the Colorado River brought to adjacent valley lands overflow of water to such an extent that the Indians were able to raise a crop of maize or corn as the spring floods receded. But with the settling of the white man along the banks of the Colorado, agitation commenced relative to control of the river and protection of the lowlands from annual spring floods. This agitation in part brought about enactment of the Swing-Johnson Bill in 1928, under authority of which Hoover Dam was constructed in Black Canyon. This dam did more, however, than protect lowlands adjacent to the Colorado from spring floods. It impounded water which normally would have run into the ocean, making such water available for use during all seasons of the year.

Early settlers in Imperial Valley discovered that since the floor of the valley was below the surface of the Colorado River, its waters could be used to irrigate valley lands; as a result early Imperial Valley settlers took water from the Colorado River a few miles north of the Mexican Border and transported it by means of a canal to the Imperial Valley. However, shortly after it received water from the Colorado, the canal found its way below the Mexican Border, so that for a good part of the distance from the Colorado River to the Imperial Valley the canal transversed Mexican territory.

Imperial Valley water users agitated for construction of an "All-American" canal—that is, a canal which transversed only United States territory. The Swing-Johnson Bill granted authority to construct an All-American Canal to carry water from the Colorado River to the Imperial and Coachella Valleys, which canal is now in operation.

But transportation of water to territory for which it is intended does not entirely solve the problem, because after water reaches the district where it is to be used, it must be distributed to the various acres. Hence, it was necessary to not only build a canal but also to arrange for distribution of the delivered water. This was not a serious problem for the Imperial Valley, as water users there had over the years constructed an adequate distribution system, and the new canal could dump its water into the distribution system then in operation in Imperial Valley. However, an entirely different problem confronted the owners of land in Coachella Valley, because very little of that land had been placed under cultivation, and practically no distribution system was in existence. Therefore, before the water of the Colorado could be used for irrigation in Coachella Valley, a distribution system had to be constructed.

The landowners of Coachella Valley organized a water district under the laws of the State of California for the purpose (among other things) of entering into a contract with the government for construction of a distribution system within the confines of Coachella Valley. In 1945, when it appeared that the Coachella Valley extension of the All-American Canal would be finally completed, the Coachella Valley County Water District (formed by the landowners within the district) and the Secretary of the Interior began negotiations on a contract for construction of a distribution system to be used as a means of delivering water from the completed

canal to the lands within the district. Finally, during the latter months of 1947 there was a meeting of minds, and a full and mutual concurrence was reached between the district and the Secretary of the Interior as to the language of the proposed contract, which was formally approved as to form by the Board of Directors of Coachella Valley County Water District.

Before such a contract could be entered into or even before it could be contemplated, under the law the government was required to ascertain certain facts. The first fact to be determined by the government was whether the proposed project was feasible from an engineering standpoint. To make such determination it was necessary to have extensive engineering data. Another fact to be determined by the government was whether the proposed work was feasible from a financial standpoint. Reclamation Project Act, 1939, 43 U.S.C.A. §§ 485–485k.

In 1947 the Honorable J. A. Krug, then Secretary of the Interior, reported to the President of the United States in regard to the Coachella Valley County Water District:

"The basic plan of the distribution system and appurtenant protective works, * * * have been thoroughly investigated by engineers competent and experienced in such matters. Upon the basis of these investigations I have found that these works have engineering feasibility.

"Analysis of repayment ability shows that the project lands can return the costs allocated to irrigation within the repayment period provided by the reclamation laws."

Reports from the Bureau of Reclamation and from the Department of the Interior relative to the engineering and financial feasibility of the project were presented to the landowners within the district. Negotiations between the water district and the government relative to the proposed distribution system extended over a period of approximately two years. Not only was it necessary for the government to be convinced the proposed project had engineering and financial feasibility, but it was necessary also to convince the landowners within the district.

At public meetings held throughout the valley, the proposed contract was discussed and explained to the voters. According to the President of the Board of Directors of the water district, one of the matters emphasized at these public meetings was the fact that under no condition would the cost exceed $13,500,000. As a result of the public meetings and discussion of the proposed contract, sentiment was aroused among the landowners favorable to accepting the contract as developed between the government and the representatives of the water district.

In pursuance of California law, a special election was called for the purpose of determining whether the district should execute the proposed contract. So that there would be no misunderstanding in the minds of the voters of the district as to that for which they were voting, the proposed contract was printed by the district and a copy thereof sent to each qualified elector, together with a sample ballot. At the special election execution of the proposed contract, in the form and containing the language and figures as submitted to the voters, was authorized; and thereafter, on December 22, 1947, the proposed contract was executed by the Board of Directors of the Coachella Valley County Water District on one hand, and the Secretary of the Interior on the other.

In accordance with the laws of the State of California and as provided in the contract, an action was filed in the Superior Court of the State of California, in and for the County of Riverside for judicial confirmation of the authorization and validity of the contract. Division 11, Part 6 of the Water Code of the State of California contains the authority for execution of contracts between districts in the State of California and the United States. It provides for the validation of such contracts and specifically prohibits any district within the State of California from entering a repayment contract with the United States unless provision is made for a fixed, maximum obligation to be paid by the district. California Water Code, § 23223.

On the 14th day of December, 1948, judgment was duly entered in the Superior Court of the State of California, in and for the County of Riverside, adjudging, decreeing and declaring that the contract mentioned herein was a valid and existing contract under the laws applicable thereto, and that the parties to said contract were vested with power and authority to execute it. Judgment in that action has long since become final.

Also pursuant to the contract the United States Government was furnished for its files copies of all of the proceedings relating to the special election and the confirmation proceedings in the Superior Court. Hence, the government knew from the very inception the results of the election, the authorization to enter into the contract, and the fact that the Superior Court, in conformity with the laws of the State of California, had decreed it was a valid contract and the parties thereto had authority to execute the same.

Although not specifically set forth in the contract, one of the matters stressed by those attempting to build in the minds of the landowners the desirability of entering into such a contract was that the work as contemplated could be completed within a two-year period but in no event longer than thirty months.

After execution of the contract it was necessary to obtain appropriations from Congress to carry on the work, and after certain appropriations had been obtained the Bureau of Reclamation laid out a program designed to complete the contemplated project. The work was divided into nine units. Work was not commenced upon all nine units simultaneously. The Bureau of Reclamation asked for contracts only upon certain designated units of the project. The Bureau of Reclamation did not itself perform the work but let it out on contract. However, the Bureau was responsible for the work under construction, and it supervised the various contractors.

More than one and one-half years after execution of the distribution system construction agreement and when the project was less than fifty percent completed, the Bureau of Reclamation announced it had arrived at a revised estimated cost of the distribution system and related works, and that to complete the work as agreed upon under the contract would require $2,700,000 more than the Bureau had first estimated. Demand was made upon the district to enter into a new contract to pay the additional estimated cost. When confronted with the proposition that it would take additional funds to complete the project, representatives of the district appeared before the Appropriations Committee in the House of Representatives. A hearing was had before a sub-committee of the Committee on Appropriations, which sub-committee caused investigation to be made as to the additional expense.

The Bureau of Reclamation contended the contract entered into between the government and the district (although definitely stating that under no conditions would it exceed $13,500,000) was nothing more than an estimate, and that the district had agreed to pay the actual costs, even though they exceeded $13,500,000. The district on the other hand contended its repayment charges were limited to $13,500,000, irrespective of the cost to the government to complete the project. Under such a situation Congress was loath to appropriate any money for completion of the work, inasmuch as the original amount of $13,500,000 had been or would be expended upon work then under contract. The Bureau of Reclamation threatened to close down the work unless a supplemental agreement was made by which the district agreed to pay the additional cost.

To obtain sufficient appropriations to complete the project, representatives of the district suggested to the Appropriations Committee that upon completion of the project (and when the actual cost thereof was known) if the Bureau of Reclamation held the view that the amount of the actual cost of construction in excess of the sum of $13,500,000 was a valid and legal obligation of the district to the United States, then and in that event the district was willing to submit the contract to a United States court of competent jurisdiction for decision by that court on such

question. As a result of this suggestion, an appropriation was made of the sum estimated to be sufficient to complete the project. The appropriation provided, in part:

"* * * That any sums thereof so expended in excess of the amount required to be repaid under the existing contract between the Coachella Valley County Water District and the United States shall be repayable by said District to the United States unless said District shall be judicially determined by a court of competent jurisdiction to be not liable therefor."

From evidence herein it appears the Bureau of Reclamation has now made three estimates as to the cost of the completed project. The original estimate made by the Bureau of $18,000,000—$4,500,000 of which was allocated to flood control—left a balance of $13,500,000 to be charged against the distribution system. In 1950 the Bureau made its second estimate, at which time it determined that in addition to the $13,500,000 chargeable to the distribution contract, an additional amount in excess of $2,700,000 would be required to complete the work. As a result of the second estimate by the Bureau, Congress appropriated $2,783,000 to complete the project. Public Law 136, 82nd Congress, 65 Stat. 258. After that appropriation was made work continued on the distribution system, and in 1952 the Bureau made a third estimate, declaring that it would take $1,419,000 in addition to the original estimated amount and the second appropriation to complete the work originally contemplated. Again (under the conditions of the first, supplemental appropriation) Congress appropriated the amount estimated by the Bureau of Reclamation to be necessary to complete the project. Although two supplemental appropriations have been made, the work on the project has not been completed as of this date, and there is nothing to indicate in the record that the last estimate as made by the Bureau of Reclamation is any more accurate than the first two or any more likely to achieve the desired result of a completed work project.

Inasmuch as no additional work was contemplated under the supplemental appropriations, the $13,500,000 was an inaccurate original estimate, or the cost of doing the work has greatly exceeded the estimate. When the contract was signed the government knew its responsibilities and liabilities, and it would have been possible, had the money been appropriated by Congress, to have let all the work at the then current prices; and if such had been done, it is probable the entire project could have been contracted for within the original amount of $13,500,000. But this the Bureau did not see fit to do. It divided the work into nine units and let contracts on the various units from time to time.

The court can take judicial notice that costs of materials have increased materially since 1948 as have costs of labor. But the district made a contract based upon going prices at the date of the contract, and since the government, if it had so desired, could have entered into contracts calling for the work to be performed at prices prevalent at that time, should the district be penalized because the Bureau of Reclamation did not see fit to let contracts for the work as soon as the agreement was executed and validated?

The government points out that the contract provides the contemplated construction was subject to the making by Congress of adequate appropriations to defray the cost of the work. However, there is no evidence before the court that Congress refused to appropriate any amount requested by the Bureau of Reclamation up to $13,500,000. Although the Secretary of the Interior reported to the President that the basic plan of the distribution system and protective works had been thoroughly investigated by engineers competent and experienced in such matters, nevertheless, there might have been a failure on the part of the engineering staff to estimate the cost correctly. However, the water district relied upon the investigation of the government engineers and relied upon their estimate of costs. Again, if the government engineers were at fault and did not make a correct estimate, should the district be required to suffer the loss?

The district has also contended before the various appropriations committees that the Bureau had not efficiently handled the project and through carelessness, neglect, or oversight, costs had been allowed to accumulate which were not properly chargeable against the district. When it appeared the government was going to demand a contract for the estimated excess, the district retained Price Waterhouse & Co., Certified Public Accountants, to make an audit of the expenditures made by the government on the project in question, and the audit report disclosed more than $500,000 had been improperly charged against the 1947 contract. When this matter was presented to the House Appropriations Sub-Committee, the subcommittee caused an investigation to be made on its own behalf. The House investigative staff in its report found there was a total sum of $409,000 improperly charged against the project.

It is the district's contention that if the work had been carried on promptly and properly and if there had been no illegal charges against the project, it could have been completed well within the original estimate. Whether or not the Bureau was prompt and efficient in handling this contract, whether or not there was undue delay in asking for and accepting bids, and whether or not there were improper charges made against the contract is of no moment, if the government is limited to $13,500,000—the original estimate. If this court should determine the district should pay the total cost of the project rather than the original, estimated cost, then it will be necessary to determine whether charges have been improperly made and whether any credit should be given the district because of delay in the Bureau's action.

Although these facts constitute a rather long and involved statement, the problem before the court is rather simple, to wit: Can the Government collect from the district the actual cost, or is it restricted to the estimated, contractual cost of $13,500,000?

The district contends a contract is a contract, regardless of whether one of the contracting parties is the government; that contracts freely and fairly entered into should be performed. During the recent political campaign General Eisenhower was reported to have said that he believed in parties living up to their contracts—nations as well as individuals; and when representatives of the district in the case at bar appeared before the Senate Appropriations Committee Senator Chavez, a member of that committee, said: "I maintain a contract is a contract whether it is made by the government or by individual persons." Also, Senator Knowland said: "I am not a lawyer, but it does seem to me that when the government makes a contract and the people make a contract, and the districts live up in good faith, they have a right to expect that the government will also."

But the government now contends the Secretary of the Interior did not have the right to execute a contract such as this which did not provide for the repayment of the entire cost; that such a contract is illegal and void; that if the repayment by the district is limited to $13,500,000 and the costs exceed that amount, the excessive cost is in the nature of an appropriation, and that Congress has the only authority to make appropriations.

In this regard it is interesting to note that although the government was provided copies of all the proceedings of the action to validate the contract (filed in the Superior Court of the State of California, in and for the County of Riverside), it did not at that time contend the contract was invalid or void in any particular. In fact, such contention was not announced until after a demand had been made upon the district for an additional contract, and the district had refused to execute such a contract. It was then the government first contended the provision of the contract relative to the cost was illegal and void because the Secretary had no authority to enter into such an agreement.

It should not be forgotten that the contract in question was prepared by the government. It is true there were negotiations between representatives of the district and representatives of the government

over a period of two years, and both the government and the district were attempting to arrive at an agreement which could be understood and performed by both parties under the laws applicable thereto. The phraseology of the contract was the language of the government—it prepared the contract. The phrase which has occasioned the difficulty: "The ultimate cost to the district of the work herein agreed to be performed by the United States shall in no event exceed the aggregate sum of [$13,500,000]" is language used for many years by the government in its contracts. In fact, it was used by the government in the Imperial Dam and All-American Canal contracts in which it was provided that ultimate cost to said districts of the Imperial Dam and the All-American Canal should in no event exceed the aggregate sum of $38,500,000. This phrase has been used in many instances. To hold that it is meaningless would, in effect, cast a doubt upon many contracts entered into by the government. To hold that when the government states in its contracts: "The ultimate cost shall not exceed [an amount stated]" in reality means, as contended by the government, that the contracting party must pay the government the actual cost regardless of the limitation of amount in the contract stated, would be placing a burden upon many landowners in many districts—a burden not contemplated nor agreed to by them when entering into contracts.

It is contended by the district that if the government's stand is correct and the district must pay the actual cost of construction, regardless of the amount, the landowners were in truth and reality (when voting to accept the contract) giving to the government a signed, blank check against their lands. There has been such criticism of "blank check" appropriations, and certainly landowners who vote obligations upon their lands should know the limits of those obligations and should not be required to pay beyond the limit specified. This is particularly true in California, as the State law provides that districts like the one in question shall not enter into contracts with the United States unless there is a definite, determined amount to be repaid by the district entering into the contract.

This is a proceeding in equity; and certainly equities are in favor of the district.

There is nothing in this case to give the slightest intimation of fraud or undue influence. There is no mistake in fact or law. The controversy which exists arises under interpretations of law. The government contends that Paragraph I of the contract discloses it was executed in behalf of the United States by the Secretary of the Interior, pursuant to certain laws of Congress which expressly granted and expressly limited his authority to contract; that he did not have any authority to execute a contract which would require the government to perform work for less than actual cost. The government says the United States is neither bound nor estopped by the acts of the Secretary of the Interior in entering into a contract or arrangement to do or cause to be done what the law does not sanction or permit; that those dealing with an agent of the United States must be held to have had notice of the limitation of his authority. Wilber Nat. Bank v. United States, 294 U.S. 120, 55 S.Ct. 362, 79 L.Ed. 798, citing Utah Power & Light Co. v. United States, 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791; United States v. San Francisco, 310 U.S. 16, 32, 60 S.Ct. 749, 84 L.Ed. 1050.

The government further contends that inasmuch as the contract was made by the Secretary of the Interior pursuant to the Reclamation Project Act of 1939, which Act expressly limited his authority to enter into contracts unless such contracts require full reimbursement of construction costs, the district must pay the costs in full. The government relies upon the rule as laid down in Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10, which sets forth that where anyone enters into an agreement with the government, he takes the risk of having accurately ascertained that he who purports to act for the government stays within the bounds of his authority. And in Whiteside v. United States, 93 U.S. 247, 257, 23 L.Ed. 882, the Court said:

"Individuals as well as courts must take notice of the extent of authority conferred by law upon a person acting in an official capacity, and the rule applies in such a case that ignorance of the law furnishes no excuse for any mistake or wrongful act."

It is the government's position that although the contract was entered into in good faith and with the assurance that it could be completed within the estimated amount set forth in the contract, nevertheless, it is not binding upon the government because the Secretary exceeded his authority.

It would seem to this court that the government takes the position that the contract in question is invalid in part. On one hand it says it has a valid contract with the district relative to repayment of $13,500,000. On the other hand, it says the Secretary had no authority to make the contract, as and when it provided that the ultimate cost would not exceed $13,500,-000. This court feels that either the Secretary had authority to enter into the contract in toto, or he did not have any authority at all; and there is no contention on the part of the government that he did not have authority to enter into the contract itself. The government picks out this one particular clause—a very minute portion of the entire contract—and says: "This clause is invalid and of no effect because the Secretary had no authority to enter into such an agreement."

If this contract were an agreement between individuals, it probably never would have reached the courts, as there is nothing ambiguous in the words employed, and certainly the phrase: "The ultimate cost to the District * * * shall in no event exceed the aggregate sum of $13,500,000.-00" is readily understood by all. We do not comprehend how any clearer language could be used.

The District contends the Secretary of the Interior did not lack authority to execute the contract herein involved under the applicable statutes. Inasmuch as many similar contracts have been executed by the Secretary, it seems rather strange at this late date to contend the Secretary did not have authority to enter into such agreements. As heretofore pointed out, before such an agreement is entered into it is necessary for the government to ascertain certain facts. The first is whether such a project is feasible from an engineering standpoint, and the second is whether the lands to be benefitted by such a contract can repay "the estimated cost."

The Reclamation Act of June 17, 1902, Chap. 1093, 32 Stat. 388, 43 U.S.C.A. §§ 419, 461, provides in part as follows:

"That upon the determination by the Secretary of the Interior that any irrigation project is practicable, * * * said charges shall be determined with a view of returning to the reclamation fund *the estimated cost of construction of the project,* * * *." [Emphasis supplied.]

The Act of May 25, 1926, Chap. 383, 44 Stat. 636, 43 U.S.C.A. § 423e, states in part:

"No water shall be delivered upon the completion of * * * a project * * * until a contract or contracts in form approved by the Secretary of the Interior shall have been made * * * providing for payment by the district or districts of the cost of constructing, * * *."

The Boulder Canyon Project Act of December 21, 1928, Chap. 42, 45 Stat. 1057, H. R. 5773, Public, No. 642, 70th Cong., 2d Sess., 43 U.S.C.A. §§ 617–617t, contains the following provisions:

"* * * the Secretary of the Interior * * * is hereby authorized to construct, operate, and maintain a dam and incidental works in the main stream of the Colorado River * * *

"* * * Before any money is appropriated for the construction * * *, the Secretary of the Interior shall make provision for revenues by contract, in accordance with the provisions of this Act, *adequate in his judgment to insure payment* of all expenses of operation and maintenance of said works incurred by the United States * * *."

The Reclamation Project Act of 1939, Act of August 4, 1939, c. 418, 53 Stat. 1187, 43 U.S.C.A. §§ 485–485k, provides, in part, as follows:

"No expenditures for the construction of any new project, * * * shall be made, nor shall estimates be submitted therefor, by the Secretary until after he has made an investigation thereof and has submitted to the President and to the Congress his report and findings on—

"(1) the engineering feasibility of the proposed construction;

"(2) *the estimated cost* of the proposed construction; [Emphasis supplied.]

* * * * * *

"If the proposed construction is found by the Secretary to have engineering feasibility and if the repayable [costs] * * * found by the Secretary to be proper, * * *."

(In the foregoing Act the term "estimated cost" is used five times in Section 9(a) and "actual cost" is not once used.)

The Act of June 26, 1947, Ch. 153, 61 Stat. 183, 80th Cong., 1st Sess., H.R. 3348, Public No. 121, an Act to declare the policy of the United States with respect to the allocation of costs of construction of the Coachella Division of the All-American Canal irrigation project, California, includes within the Act appurtenant structures, including distribution and drainage systems.

In the Acts referred to above, only once does the government require the payment of total costs. In the Omnibus Adjustment Act of May 25, 1926, Congress provided that no water should be delivered until there had been obtained contracts for the payment of the cost of construction. In all other Acts the term used is "estimated cost."

It is absolutely impossible to know the ultimate, exact costs of reclamation projects. Although the greatest of engineering skill may be used and detailed reports and findings made, nevertheless after actual work has commenced unforeseen difficulties may arise, with the consequence that the project may cost a great deal more than estimated. However, before such a project is commenced, it is necessary for the Secretary of the Interior to enter into contracts. Some basis must be determined on which to fix a contract, and time and time again Congress has used the terms "estimated cost" or "cost adequate in his [Secretary of the Interior] judgment." The duty is placed upon the Secretary of the Interior to determine an amount adequate in his judgment and sufficiently high to cover actual costs.

It is doubtful whether any contracts could be obtained with landowners by the Bureau of Reclamation if the landowners were informed that they might be responsible for all costs, irrespective of the amount and regardless of whether or not the lands to be benefitted could bear the financial burden. Landowners like those within Coachella Valley, when voting to enter into a contract, want to know the limits of their liability. If there were not such a fixed ceiling, these contracts would come within the thought as expressed by the Supreme Court in The Western Maid, 257 U.S. 419, 433, 42 S.Ct. 159, 161, 66 L. Ed. 299:

"* * * Legal obligations that exist but cannot be enforced are ghosts that are seen in the law but that are elusive to the grasp."

Certainly when the contract in question was signed by the irrigation district, the members were not grasping a ghost which could elusively slip through their fingers or change its character at the whim of a government official.

A contract is a contract, regardless of whether it is made between individuals or between individuals and a government agency; and if made with an agency, the latter should not have a right to change any terms of the duly executed and partially performed contract.

From the foregoing, this court is of the opinion the government is restricted to the terms of its contract, which provides that under no circumstances shall the cost exceed $13,500,000.

Judgment will be for defendant; findings of fact and conclusions of law to be prepared by counsel for defendant in conformity herewith, for presentation to the court on or before April 25, 1953.