781 F.2d 1141
 HETTIG & COMPANY, Richard B. Hettig, John E. Hettig, W.
Barry Kahn and Douglas Hicks,
Plaintiffs-Appellants/Cross-Appellees,
v.
UNION MUTUAL LIFE INSURANCE COMPANY,
Defendant-Appellee/Cross-Appellant.
 No. 85-2560
 
 Summary Calendar.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 5, 1986.
 Schlanger, Cook, Cohn, Mills & Grossberg, H. Miles Cohn, Houston, Tex., for plaintiffs-appellants/cross-appellees.
 Johnson & Swanson, Mark T. Davenport, Doug K. Butler, Dallas, Tex., for defendant-appellee/cross-appellant.
 Appeals from the United States District Court for the Southern District of Texas.
 Before CLARK, Chief Judge, WILLIAMS, and HIGGINBOTHAM, Circuit Judges.
 PATRICK E. HIGGINBOTHAM, Circuit Judge:
 
 
 1
 We here interpret under Texas law provisions in a promissory note governing the calculation and payment of a prepayment premium. The district court, finding the provisions unambiguous, granted summary judgment. Because the provisions are susceptible to either of two opposing interpretations, we find them ambiguous, and reverse and remand for trial to consider extrinsic evidence necessary to resolve the ambiguity.
 
 
 2
 * In September 1982 Union Mutual loaned money to a Texas limited partnership, 770 South Post Oak Office Building Ltd., for the partnership's purchase of real property in Houston, Texas. Plaintiffs were general and limited partners in the partnership, which executed a $4,040,000 note and deed of trust in connection with the loan.
 
 
 3
 In November 1983 the partnership informed Union Mutual that it was selling the acquired property, and that it intended to prepay the balance of the loan. While the partnership calculated that the prepayment premium was $431,034.38, it paid under protest Union Mutual's demand of $756,658.40, in order to obtain a release of Union Mutual's lien and to close the sale. Plaintiffs filed this suit as the partnership's assignees in order to recover the difference of $325,624.02; for convenience we will refer to these assignees as borrowers and Union Mutual as the lender.
 
 
 4
 The provisions for calculating the prepayment premium are in the fifth paragraph of the note, which states:
 
 
 5
 From and after the date hereof, Maker shall not have any right, except as otherwise specifically provided, to prepay all or a portion of the principal balance of this Note until one (1) loan year has elapsed, a "loan year" being for purposes of this Note each successive twelve (12) month period beginning with the first day of the month following the Purchase Date. Commencing with the second (2nd) loan year, on any payment date thereafter and with sixty (60) days' prior written notice to Holder thereof, the entire principal balance only may be prepaid. Any prepaid amounts specified in such prior written notice together with the applicable prepayment premium shall become due and payable at the time provided in said notice. In the event of such prepayment, a premium shall be charged equal to the greater of (1) ten percent (10%) of the principal amount or (2) an amount determined by Holder to be necessary to be paid at the time of prepayment to ensure Holder a 15.875% nominal rate of return on its investment over the anticipated five (5) year investment term, assuming the principal amount received at the time of prepayment is invested in U.S. Treasury Bills, Notes or Bonds selected by Holder and maturing at or near the original maturity date of this Note, plus one percent (1%) of the principal amount to cover the costs of such reinvestment. Such prepayment premium as outlined in item (2) above shall be defined as the difference between the absolute cumulative total of all interest payments to be received by Holder during the full five (5) year term, and the absolute cumulative total of all interest payments received to the date of prepayment plus absolute cumulative total of all interest payments to be received by maturity if reinvested in U.S. Treasury Securities as outlined above....
 
 
 6
 If the loan is prepaid involuntarily at any time during the loan term due to an acceleration after default, a premium shall be paid to Holder in the amount of the greater of (1) 15.875% of the principal amount, or (2) as outlined in item (2) above. There shall be no prepayment premium due and payable if the principal sum is prepaid with fire and/or casualty insurance proceeds or condemnation awards. Notwithstanding the foregoing, however, in the event of acceleration of the Note at any time and subsequent involuntary or voluntary prepayment, the premium payable in respect thereof shall in no event exceed an amount equal to the excess, if any, of (i) interest calculated at the highest applicable rate permitted by the usury laws of the State of Texas, as construed by courts having jurisdiction thereof, on the principal balance of the Note from time to time outstanding from the date hereof to the date of such acceleration, over (ii) interest theretofore paid and accrued on the Note. [emphasis added].
 
 
 7
 The dispute over the proper prepayment premium rests on conflicting interpretations of the italicized language, or limiting clause, in the second subparagraph. The lender does not dispute that if the limiting clause applies, the premium due was $431,034.38 as claimed by borrowers. Similarly, borrowers do not dispute that if the limiting clause is inapplicable, the higher amount demanded by the lender was correct.
 
 
 8
 Borrowers argue that "acceleration" in the limiting clause can be effected either by the lender as a penalty for the borrowers' default, or by the borrowers' notice of intent to prepay the note. Thus, after borrowers "accelerate" the note by giving such notice, as here, the payment is a "voluntary prepayment," so that the limiting clause is applicable.
 
 
 9
 The lender, in contrast, argues that "acceleration" is a term of art commonly understood as a right that can be exercised only by the holder of a note. Because the lender did not accelerate the note, and the limiting clause applies only to accelerations, the limiting clause does not apply to borrowers' prepayment.
 
 
 10
 On cross-motions for summary judgment, the district court was persuaded by the lender that the limiting clause did not apply. The court reasoned that if borrowers' interpretation of "acceleration" were adopted, no prepayment could occur without an acceleration, and the limiting clause would apply to any prepayment. In the court's view, the limiting clause would thereby subsume the formulas given in the first subparagraph for calculating the size of the prepayment premium, consigning them "to oblivion." It therefore concluded that the lender's interpretation was the only reasonable one.
 
 II
 
 11
 Under Texas law, bills and notes are interpreted in the same manner and under the same principles as contracts. Echols v. Professional Fin. Assocs., Inc., 607 S.W.2d 292, 294 (Tex.Civ.App.--Texarkana 1980, writ ref'd n.r.e.). The question of whether a contract is ambiguous is a question of law, Measday v. Kwik-Kopy Corp., 713 F.2d 118, 123 (5th Cir.1983); Coker v. Coker, 650 S.W.2d 391, 394 (Tex.1983), and not subject to the clearly erroneous rule on appeal. Thornton v. Bean Contracting Co., Inc., 592 F.2d 1287, 1290 (5th Cir.1980). A contractual provision is ambiguous if, after applying established rules of construction, it is reasonably subject to more than one meaning. Watkins v. Petro-Search, Inc., 689 F.2d 537, 538 (5th Cir.1982); R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 519 (Tex.1980). In construing a contract, the court must strive to give meaning to all the language. Chadwick v. Esperanza Trade & Transport, Ltd., 548 F.2d 1161, 1162 (5th Cir.1977); Coker, 650 S.W.2d at 394. Finally, the court must examine the wording of the contract in the light of circumstances existing at the time of the contract's making, excluding statements of the parties as to what they intended. Vendig v. Traylor, 604 S.W.2d 424, 427 (Tex.Civ.App.--Dallas 1980, writ ref'd n.r.e.); see also City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 519 (Tex.1968).
 
 
 12
 Keeping in mind these rules of construction, we reject the reasoning of the district court. The court erroneously concluded that applying the limiting clause to all prepayments would nullify the first subparagraph of Paragraph Five. The limiting clause is based on the maximum non-usurious interest that could have been earned on the principal balance of the note from the initial date until the date of acceleration; the allowable premium under the limiting clause is continually increasing during the life of the note. In contrast, the prepayment premium calculations in the first subparagraph determine the sum necessary to guarantee the holder a total return on its principal at the note interest rate for the full term of the note. The later the date at which prepayment is made, the greater will be the interest already paid to the holder. Thus, the prepayment premium calculation decreases as the term of the note progresses, while the maximum allowable premium under the limiting clause continually increases.
 
 
 13
 The district court's reasoning correctly assumes that early in the term of the note, the maximum allowable premium under the clause is very low, and would override the high prepayment premium as calculated under the formulas in the first subparagraph. However, later in the note's term, when the maximum allowable premium under the limiting clause has increased, the formulas in the first subparagraph would apply. The limiting clause thus acts as an upper limit early in the term of the note, but does not obviate the first subparagraph later in the note's term. Moreover, the district court's argument fails because if the limiting clause did nullify the formulas in the first subparagraph, it would nullify those in the second subparagraph for involuntary prepayments as well, since both involve the same calculation. The district court's reasoning proves too much; it would leave the limiting clause without any meaning whatever.
 
 III
 
 14
 We now consider whether there is any other basis for finding the note unambiguous. Borrowers point out that under Paragraph Five, once notice is given of intent to prepay, prepayment "become[s] due and payable at the time provided in said notice"; the maturity date is changed to the present, thereby "accelerating" the note. The borrowers' notice of intent to prepay is binding; they cannot change plans and revert to the original maturity date.
 
 
 15
 That this "acceleration" of the note by the borrower is subject to the limiting clause is evident, they argue, because the language of the limiting clause refers to both "involuntary or voluntary prepayment[s]." Voluntary prepayments are those described in the first subparagraph in which the borrowers elect to prepay the note. Involuntary prepayments are those referred to at the beginning of the second subparagraph, where "the loan is prepaid involuntarily at any time during the loan term due to an acceleration after default." Borrowers argue that if the limiting clause applies only to involuntary prepayments following acceleration after default, the language in the limiting clause referring to "voluntary prepayments" is rendered meaningless.
 
 
 16
 Moreover, borrowers point out that the first sentence in the second subparagraph refers to "an acceleration after default," while the limiting clause refers to "acceleration of the Note at any time " [emphasis added to both]. Borrowers argue that if acceleration as defined by the limiting clause can only be effected by the lender, then the distinction between acceleration "after default" and acceleration "at any time" is also rendered meaningless. Since all language in a contract is presumed to have some meaning, borrowers argue the term "acceleration" in the limiting clause must be read to refer to both voluntary prepayments and involuntary prepayments after default. The strength of borrowers' argument lies in the fact that it does give meaning to all the contractual terms.
 
 
 17
 The lender, in contrast, argues at length that the terms "prepayment" and "acceleration" are terms of art with technical legal meanings. Acceleration, argues the lender, is commonly understood as the unilateral act of the creditor whereby the creditor declares the entire balance of a note due upon the happening of a stated condition such as a default. Assuming arguendo that this proposition is correct, and that an acceleration can therefore only be effected by the lender, it fails to explain what could constitute a "voluntary prepayment" after acceleration as described in the limiting clause.
 
 
 18
 The lender attempts to give meaning to the voluntary/involuntary distinction in the limiting clause, despite its position that "acceleration" can be effected only by the holder of a note, by arguing that a voluntary prepayment occurs after the lender accelerates the note and the borrower, without demand or legal process, pays the obligation in full. Involuntary prepayment, on the other hand, occurs where the borrower refuses to pay and the lender is required to foreclose or sue to recover the amount due. We are unpersuaded by this interpretation. Once a note has been accelerated by the lender upon default, the borrowers' obligation to pay is fixed. It is unreasonable to view any payment thereafter as voluntary.
 
 
 19
 Moreover, the lender's interpretation would leave the note without any provision for calculating the prepayment premium for such "voluntary prepayments" following acceleration by the lender. The note, in the first subparagraph of Paragraph Five, provides a calculation for prepayments made upon election of the borrowers. The first sentence of the second subparagraph provides the calculation for involuntary prepayments due to acceleration upon default. No provision is provided for the third kind of prepayment asserted by the lender--"voluntary" prepayments after acceleration upon default--leading to the conclusion that the voluntary prepayments discussed in the limiting clause must be those described in the first subparagraph.
 
 
 20
 Absent other considerations, we would be inclined to agree with borrowers that the limiting clause applies on its face to both voluntary prepayments initiated by borrowers and involuntary prepayments following default. The lender, however, argues that the limiting clause's obvious purpose is to escape Texas usury law. A note which allows acceleration upon default and provides for collection of unearned interest is usurious if the amount of total interest collected exceeds the allowable rate for the accelerated period of the note. See generally Conte v. Greater Houston Bank, 641 S.W.2d 411, 417-18 (Tex.App.--Houston [14th Dist.] 1982, writ ref'd n.r.e.), and cases cited therein. In contrast, a prepayment penalty is not regarded as "interest" within the meaning of the usury statutes, so that a voluntary prepayment which calls for a prepayment premium exceeding the allowable interest rates does not constitute usury. Bearden v. Tarrant Sav. Ass'n., 643 S.W.2d 247, 249 (Tex.App.--Fort. Worth 1982, writ ref'd n.r.e.); Ware v. Traveler's Indem. Co., 604 S.W.2d 400, 401 (Tex.Civ.App.--San Antonio 1980, writ ref'd n.r.e.).
 
 
 21
 The lender therefore argues that the limiting clause, necessary to prevent the note from being usurious upon prepayment after default, is unnecessary when prepayment is voluntary. This argument is supported by the placement of the limiting clause at the end of the second subparagraph, where by implication it would apply only to prepayments upon default as covered in that subparagraph. The lender concludes that the only sensible purpose of the limiting clause is to prevent prepayments after default from being usurious, and that it should be read to fulfill this purpose. Borrowers respond that the limiting clause may have been intended to cover voluntary prepayments as a hedge against change in Texas usury law. We are unpersuaded. The note, at Paragraph 14, contains a usury "savings clause" which explicitly covers such a change in law.
 
 
 22
 We conclude that in this note the limiting clause is ambiguous. The lender's interpretation leaves the term "voluntary prepayment" in the limiting clause without meaning. On the other hand, borrowers' interpretation, while more syntactically defensible, ignores a plain commercially reasonable purpose for the limiting clause. Because the note is as reasonably susceptible to one interpretation as the other, we remand the case for trial to consider any extrinsic evidence which sheds light on the actual meaning of this ambiguous provision.
 
 IV
 
 23
 Union Mutual cross-appeals the district court's denial of its motion for attorneys' fees pursuant to Paragraph Nine of the note, which provides them "in the event the Holder is made party to any litigation because of the existence of the indebtedness evidenced by this Note." We do not reach this issue.
 
 
 24
 REVERSED AND REMANDED.