CENTRAL ARIZONA WATER CONSER-
VATION DISTRICT, a municipal corpo-
ration of the State of Arizona, Plaintiff,

v.

UNITED STATES of America,
et al., Defendants.

United States of America,
Counterclaimant,

v.

Central Arizona Water Conservation
District, Counterdefendant.

Nos. Civ. 95–625–TUC–WDB–EHC,
Civ. 95–1720–PHX–EHC.

United States District Court,
D. Arizona.

Nov. 3, 1998.

John J. Bouma, Snell & Wilmer LLP, Phoenix, AZ, Stuart Leslie Somach, De Cuir & Somach, Sacramento, CA, for plaintiff.

Richard Glenn Patrick, U.S. Attorney's Office, Phoenix, AZ, J. Christopher Kohn, John T. Stemplewicz, Phillip M Seligman, U.S. Dept. of Justice, Washington, DC, Andrea J Larry, U.S. Dept. of Justice, Washington, DC, for defendants.

Scot C. Stirling, Marvin S. Cohen, Sacks Tierney & Kasen PA, Phoenix, AZ, for Tucson, City of, counter-defendant.

Jesse W. Sears, Roderick Gregory McDougall, Office of the City Attorney, Phoenix, AZ, for Phoenix, City of, intervenor.

Cynthia J. Haglin, Chandler City Attorney's Office, Chandler, AZ, Paul G Ulrich, Thomas F. Ames, Ulrich Kessler & Anger PC, Phoenix, AZ, William H Anger, Ulrich Kessler & Anger, Phoenix, AZ, for Chandler, City of, intervenor.

James M. Flenner, Office of the City Attorney, City of Glendale, Glendale, AZ, Paul G Ulrich, Thomas F. Ames, Ulrich Kessler & Anger PC, Phoenix, AZ, William H Anger, Ulrich Kessler & Anger, Phoenix, AZ, for Glendale, City of, intervenor.

James H. Oeser, Phoenix, AZ, Paul G Ulrich, Thomas F Ames, Ulrich Kessler & Anger PC, Phoenix, AZ, William H Anger, Ulrich Kessler & Anger, Phoenix, AZ, Ronald L Keyser PC, Phoenix, AZ, for Goodyear, City of, intervenor.

Stephen Joseph Burg, Mesa City Prosecutor's Office, Mesa, AZ, Paul G Ulrich, Thomas F Ames, Ulrich Kessler & Anger PC, Phoenix, AZ, William H Anger, Ulrich Kessler & Anger, Phoenix, AZ, for Mesa, City of, intervenor.

Paul G. Ulrich, Thomas F. Ames, Ulrich Kessler & Anger PC, Phoenix, AZ, William H Anger, Ulrich Kessler & Anger, Phoenix, AZ, Stephen Mark Kemp, City of Peoria,

Assistant City Attorney, Peoria, AZ, for Peoria, City of, intervenor.

Barbara R. Goldberg, Scottsdale City Attorney's Office, Scottsdale, AZ, Paul G Ulrich, Thomas F. Ames, Ulrich Kessler & Anger PC, Phoenix, AZ, William H. Anger, Ulrich Kessler & Anger, Phoenix, AZ, for Scottsdale, City of, intervenor.

William Kent Foree, Tempe City Attorney, Tempe, AZ, Karen Sinodis Gaylord, City of Tempe City Attorneys Office, Tempe, AZ, for Tempe, City of, intervenor.

Daniel James Quigley, Quigley Tang & Whitehill PLC, Tucson, AZ, for Tohono O'Odham Nation, intervenor.

M Byron Lewis, Salmon Lewis & Weldon PLC, Phoenix, AZ, for Salt River Project Agricultural Improvement and Power District, intervenor.

M Byron Lewis, Salmon Lewis & Weldon PLC, Phoenix, AZ, for Salt River Valley Water Users Association, intervenor.

## ORDER

CARROLL, District Judge.

This action for declaratory and injunctive relief was initiated to resolve a series of disputes arising out of the construction, operation and maintenance of the Central Arizona Project, a 335–mile long, water conveyance system designed to divert an average of 1,500,000 acre-feet of water annually from the Colorado River to central and southern Arizona.

Because of the numerous and complex issues presented, the Court entered a pretrial order providing for trial in six phases. The trial of Phase One has been completed, and this Order is directed to the disposition of the issues presented in that phase.

The primary dispute in Phase One concerns two provisions in the 1988 Amended Master Repayment Contract between the United States and the Central Arizona Water Conservation District ("CAWCD") relating to the maximum amount that CAWCD is obligated to repay to the United States for "reimbursable construction costs" as defined in the 1988 repayment contract. At issue is whether the parties intended to create a $2.0 billion or a $1.781 billion repayment ceiling. The United States contends that the parties negotiated a fixed $2.0 billion ceiling. CAWCD, on the other hand, urges that the parties agreed to have a variable repayment ceiling which would be reduced from $2.0 billion to $1.781 billion if the Gila River Indian Community subsequently executed a water delivery contract with the Secretary of Interior, which it did on October 22, 1992.

A number of related issues were also tried in the Phase One trial. The United States argues that CAWCD has waived the repayment ceiling or is estopped from asserting it. The United States also argues that CAWCD is obligated to repay reimbursable costs above the ceiling under implied-at-law contract theories of *quantum meruit* and unjust enrichment. The United States further argues that CAWCD must repay all reimbursable construction costs, regardless whether the repayment ceiling in the 1988 Agreement is $2.0 billion or $1.781 billion. CAWCD denies liability for any costs above the repayment ceiling, and maintains that it is not responsible for such costs in the absence of an amendatory contract.

An issue is also presented concerning CAWCD's right to continue using Central Arizona Project facilities without paying reimbursable costs incurred by the United States in excess of the repayment ceiling, if, in fact, reimbursable costs have exceeded the repayment ceiling. The United States contends that the 1988 Agreement permits it to restrict CAWCD from using CAP facilities unless and until an amendatory contract has been executed to cover any excess reimbursable costs.

A bench trial was held on August 4–11, 1998. After considering the testimony of the witnesses, the admitted exhibits and the arguments of counsel, the Court renders the following decision.

### A. Procedural Background

A detailed discussion of the procedural history that eventually led to the present posture of this consolidated action is not pertinent to any issues to be considered in this Order. For the purposes of this Order, it is sufficient to note that two separate actions, the first filed by CAWCD against the United States as the principal defendant, and the

second filed by the United States against CAWCD, have been consolidated, with the United States being realigned as a party defendant and counterclaimant in the consolidated action.

## B. The Parties

Plaintiff and counterdefendant CAWCD is a political subdivision and municipal corporation of the State of Arizona. It is a tax levying, public improvement district formed pursuant to Arizona law to provide water supply benefits within Maricopa, Pinal and Pima Counties, exclusive of the Indian lands included in their boundaries. CAWCD was formed for the express purpose of entering into a contract with the United States providing for the construction of the Central Arizona Project ("CAP").

As previously stated, the United States is the principal defendant and sole counterclaimant. Also named as defendants in the Consolidated Action are the United States Department of Interior and the Bureau of Reclamation ("Reclamation"), an agency within the Department of Interior; Bruce Babbitt, the Secretary of the Department of the Interior (the "Secretary"); Patricia Beneke, the Assistant Secretary of the Department of Interior; Eluid L. Martinez, the Commissioner of the Bureau of Reclamation and successor to Daniel P. Beard (his name is substituted for Beard's pursuant to Fed. R.Civ.P. 25(d)); and Robert Johnson, the Regional Director of the Lower Colorado Region of the Bureau of Reclamation and successor to Lawrence F. Hancock (his name is substituted for Hancock's pursuant to Fed. R.Civ.P. 25(d)).

Intervenors include the Tohono O'odham Nation, a Federally-recognized Indian tribe organized under Section 16 of the Indian Reorganization Act of 1934; the Central Arizona Irrigation and Drainage District ("CAIDD"), a political subdivision and municipal corporation of the State of Arizona; and the Arizona cities of Chandler, Glendale, Goodyear, Mesa, Peoria, Phoenix, Scottsdale, Tempe, and Tucson.

## C. Overview of the Central Arizona Project[1]

In 1902, Congress passed the Reclamation Act, 43 U.S.C. §§ 391, et seq. The primary purpose of the Reclamation Act was to encourage and facilitate the development of arid and semi-arid lands in the western United States by constructing and maintaining irrigation works for the storage, diversion and development of water for family-sized farms. (Undisputed Fact ("UF") ¶ A1).[2] In 1922, the seven Colorado River Basin states signed the Colorado River Compact, which divided the Colorado River Basin into an Upper Basin and a Lower Basin. The Compact apportioned 7.5 million acre-feet of water annually to the states of the Lower Basin (Arizona, Nevada, and California) and an equal amount of water to the Upper Basin states (Colorado, Utah, New Mexico, and Wyoming).[3]

All of the Colorado River Basin states except Arizona ratified the Colorado River Compact in 1923. (UF ¶ A2). Arizona subsequently ratified the Colorado River Compact in 1944 and signed a contract with the Secretary for its 2.8 million acre-feet annual allotment of Colorado River water. (UF ¶ A4).

The Boulder Canyon Project Act of 1928 parceled water among the Lower Basin states, allotting Arizona 2.8 million acre-feet annually. See 43 U.S.C. § 617. California was allotted 4.4 million acre-feet annually, and Nevada 300,000 acre-feet annually. The Act gave the Secretary broad administrative authority over the water, including the power to apportion water within the states. See id.

In 1963, the United States Supreme Court confirmed the Lower Basin apportionment in Arizona v. California, 373 U.S. 546, 83 S.Ct.

1. Portions of this overview will be pertinent only to future trial phases.

2. Undisputed Facts are taken from pages 7–16 of the parties' Joint Pretrial Statement for Phase One. The letter (A, B or C) corresponds to the section in the Pretrial Statement. The number identifies the paragraph within that section.

3. An acre-foot is the amount of water that it would take to cover one acre of land to a depth of twelve inches. It is enough water to meet the needs of a family of five for one year.

1468, 10 L.Ed.2d 542 (1963). The case established Arizona's right to an annual allotment of 2.8 million acre-feet of Colorado River water. (UF ¶ A7).

Of particular importance to this litigation, the Colorado River Basin Project Act was enacted in 1968. 43 U.S.C. §§ 1501–1556. The Basin Project Act authorized the Secretary to build, operate, and maintain the Central Arizona Project (the "CAP"), a multipurpose development project enabling the State of Arizona to divert approximately 1.5 million acre-feet of water from the Colorado River in normal years to central and southern Arizona.[4] (UF ¶ A10).

The CAP is a 335-mile long, water conveyance system consisting of a series of pumping plants, open concrete-lined canals, inverted siphons, pipelines and tunnels that carry water from the Mark Wilmer Pumping Plant at Lake Havasu on the Colorado River to the greater metropolitan Phoenix area via the Hayden–Rhodes Aqueduct, to the Pinal County area via the Fannin–McFarland Aqueduct, and to the metropolitan Tucson area via the Tucson Aqueduct. Construction of the CAP aqueduct system began in 1973 and water was first delivered to central Arizona in 1985. (UF ¶ A11).

The Basin Project Act authorized the appropriation of up to $832,180,000, based on 1967 cost estimates, for construction of the CAP. The appropriation ceiling was indexed for inflation and other factors. The Act authorized the following principal works: (a) a main aqueduct system and pumping plants to transport water; (b) an interest in a thermal generating power plant; (c) Orme Dam on the Salt River (or suitable alternative); (d) Buttes Dam on the Gila River near Florence; (e) Hooker Dam on the Gila River in New Mexico (or suitable alternative); and (f) Charleston Dam on the San Pedro River. (UF ¶ A10).

The Basin Project Act also created the Lower Colorado River Basin Development Fund (the "Development Fund"), 43 U.S.C. § 1543. Pursuant to the act, surplus power revenues from the sale of certain power generated at Hoover, Parker and Davis Dams are to be deposited into the Development Fund and used to assist in CAP repayment. (UF ¶ A14).

The Basin Project Act also authorized the Secretary to contract with non-federal interests proposing to construct a thermal power plant. In 1969, the United States entered into the Navajo Project Participation Agreement with Arizona Public Service Company, Los Angeles Department of Water and Power, Nevada Power Company, Salt River Project Agricultural Improvement and Power District ("SRP"), and Tucson Gas & Electric Company. Under this agreement, the United States acquired a 24.3% interest in the Navajo Generating Station (the "Navajo Station") at Page, Arizona.[5] (UF ¶ A12).

The Basin Project Act also authorized the Secretary to contract for the repayment of CAP construction and operating costs with a single political subdivision in Arizona. 43 U.S.C. § 1524(b). In 1971, Arizona created the Central Arizona Water Conservation District ("CAWCD") for this purpose. See Ariz. Rev.Stat. §§ 48–3701, et seq.

The Secretary is responsible for allocating CAP construction and operating costs among the various authorized CAP functions and then determining which of those allocated costs are reimbursable to the United States. CAWCD was required to enter into a repayment contract with the United States to cover these costs. (UF ¶ A13).

Authorized CAP functions include commercial power, irrigation, municipal and industrial (M & I) water supply, flood control, recreation, and fish and wildlife enhancement. (Id.). Costs which are allocated to recreation, flood control, and fish and wildlife enhancement are not reimbursable by CAWCD. (Id.).

Costs which are allocated to commercial power and non-Indian water supply are reimbursable. (Id.). The non-Indian water

---

4. The remaining 1.3 million acre-feet of water is reserved for diversion into western Arizona. See *Maricopa–Stanfield Irrigation and Drainage District v. United States*, 147 F.3d 1168, 1171 n. 3 (9th Cir.1998).

5. Construction of the Navajo Station began in 1974 and was completed in 1976. Issues related to the Development Fund and the Navajo Generating Station will be litigated in subsequent phases.

supply is further subdivided into non-Indian agricultural water supply, which is repaid without interest, and M & I water supply, which is repaid with interest. The suballocation of the construction costs allocated to the water supply function is in direct proportion to the amount of CAP water projected to be delivered over the 50–year repayment period to the three classes of water supply users: Indian, M & I, and non-Indian agricultural.

Costs which are allocated to Indian water supply and within the repayment capability of the Indian lands served by that water are reimbursable, but are automatically deferred as long as those lands remain under Indian control. Costs allocated to Indian water supply and beyond the repayment capability of the Indian lands are non-reimbursable. (*Id.*).

Negotiations between CAWCD and Reclamation to establish the terms of a master repayment contract began in early 1972. (Sutter Dep. of 8/26/97 ("Sutter Dep.") at 10). It took several months before a final draft of the master repayment contract was agreeable to all parties. (Sutter Dep. at 14).

### D. The 1972 Master Repayment Contract

On December 15, 1972, the Secretary and CAWCD signed the master repayment contract for the delivery of water and repayment of reimbursable costs of the CAP (the "1972 Agreement") The Maricopa County Superior Court validated the 1972 Agreement in 1983 pursuant to Ariz.Rev.Stat. §§ 48–3731 to 48–3734.

In the 1972 Agreement, CAWCD and Reclamation agreed to limit CAWCD's maximum repayment obligation to $1,200,000,000. (Exhibit A, Art. 9.3(b)). CAWCD originally proposed the idea of a repayment ceiling so that the federal government would not have a "blank check" to spend on building the CAP. (Sutter Dep. at 15, 21). The Bureau of Reclamation proposed setting the repayment ceiling at $1.2 billion and there was no objection from CAWCD. (*Id.* at 22–23).

CAWCD's repayment obligation under the 1972 Agreement was estimated at $1,064,535,000. (Exhibit 18 at 2). The difference between the estimated repayment obligation and the $1.2 billion repayment ceiling was intended to allow for unforeseen contingencies and cost overruns. (Sutter Dep. at 52). Article 9.3(b) of the 1972 Agreement provided for cessation of construction if it was determined that construction costs were going to exceed the $1.2 billion repayment ceiling, escalated by reasonable inflation, unless the parties executed an amendatory contract to cover the excess reimbursable costs. (Exhibit A, Art. 9.3(b)).

Another provision of the 1972 Agreement relevant to this lawsuit is Article 6.7. Article 6.7 provided that if construction costs exceeded the appropriations ceiling, the Secretary may, after consultation with CAWCD, terminate construction and declare the United States' obligations under the 1972 Agreement to be complete.

Several events occurred subsequent to the signing of the 1972 Agreement which resulted in reimbursable construction costs exceeding the $1.2 billion ceiling. For example, inflationary factors did not take a sufficient construction period into account. Also, cost estimates forming the basis of the $1.2 billion figure did not take into consideration the full impact of new environmental legislation, including the Endangered Species Act and the National Environmental Policy Act. (Tr. 8/6/98 (Morton) at 306–310).

In part, financial concerns relative to CAP construction gave rise in 1986 to the "Plan Six Agreement" involving the United States, CAWCD, and several other non-Federal entities. Plan Six was adopted to replace the flood control and regulatory storage functions of Orme Dam, an abandoned feature of the CAP. Plan Six features included: New Waddell Dam on the Agua Fria River; modifications to the Roosevelt Dam on the Salt River ("Modified Roosevelt Dam"); and Cliff Dam on the Verde River. Cliff Dam was subsequently abandoned for environmental reasons. (Exhibit 118 at 2).

The Plan Six Agreement, executed on April 15, 1986 and subsequently modified on July 1, 1987, provided for non-Federal cost-sharing in the construction of Plan Six features and offered significant financial incentives for the United States to construct the CAP within specified time frames. (*Id.* at 11–14; Exhibit 125 at A–1). The Plan Six Agreement also reduced the level of appro-

priations that would be needed to complete construction of the CAP, thus reducing the likelihood of exceeding the appropriations ceiling. (Tr. 8/6/98 (Morton) at 315–16). The Plan Six Agreement established assured schedules for completion of the Plan Six features. (*Id.* at 316).

Beginning in approximately 1984, the United States agreed to allow CAWCD to operate and maintain portions of the water supply system that became operational. Also during this time, CAWCD started assuming a direct role in CAP construction activities. (Tr. 8/5/98 (Maxey) at 250–52). On August 5, 1987, the United States and CAWCD signed Contract No. 7–07–30–W0167 ("O & M Transfer Contract"), which provided a framework for the formal transfer of CAP operation and maintenance responsibility to CAWCD. (Exhibit 126).

Cost allocation studies conducted by the Bureau of Reclamation between 1972 and 1986 determined that CAWCD's share of CAP reimbursable costs would exceed the $1.2 billion repayment ceiling set forth in the 1972 Master Agreement. (Exhibit C; Exhibit 114). Reclamation formally notified CAWCD on October 21, 1986 that its repayment obligation was estimated to exceed $1.2 billion and that continuation of construction was contingent upon increasing the repayment ceiling. (Exhibit C). Accordingly, CAWCD and Reclamation agreed to amend the 1972 Agreement. The need for a new repayment ceiling was the primary purpose for amending the 1972 Agreement. (Exhibit B, Art. 3.6; Tr. 8/4/98 (Clark) at 104; Tr. 8/6/98 (Morton) at 325).

### E. The 1988 Amended Master Repayment Contract

On December 1, 1988, CAWCD and Reclamation signed the Amended Master Repayment Contract (the "1988 Agreement") CAWCD and the United States used the 1972 Agreement as a starting point in drafting the 1988 Agreement. (Exhibit 30; Tr. 8/4/98 (Clark) at 73). Several of the Articles in the 1988 Agreement were taken verbatim from the 1972 Agreement. (Tr. 8/4/98 (Clark) at 73–74; Tr. 8/11/98 (Hvinden) at

613). The Maricopa County Superior Court validated the 1988 Agreement on January 7, 1991. Upon validation, the 1988 Agreement superseded the 1972 Agreement. (Exhibit B, Art. 11).

The primary purpose for amending the 1972 Agreement was to increase CAWCD's maximum repayment obligation to a level sufficient to facilitate completion of the CAP. (Exhibit B, Art. 3.6; Tr. 8/4/98 (Clark) at 70). However, both sides were willing to accommodate other changes that would minimize potential criticism of the project and help facilitate timely funding and completion. (Exhibit 139 at 5).

Article 5.30 of the 1988 Agreement divided construction of the CAP into six stages. Stage One consisted of the water supply system. Stage Two consisted of the New Waddell and Modified Roosevelt Dams (*i.e.,* the Plan Six features). Stages Three, Four, Five and Six consisted of the Tucson terminal storage, the Cliff Dam alternative, the Hooker Dam alternative, and the Buttes Dam, respectively.[6]

The 1988 Agreement conditioned CAWCD's repayment obligation on substantial completion of each of the stages rather than completion of the entire project. (Exhibit B, Art. 9.4(a)). The early repayment of construction costs substantially benefitted both CAWCD and the United States. (Exhibit 139 at 6–8; Tr. 8/4/98 (Clark) at 76–77, 110–11).

As noted earlier, several of the provisions in the 1988 Agreement were identical to their 1972 predecessors. One such provision was Article 6.7, which was carried over into the 1988 Agreement unchanged. Article 6.7 was not the subject of any discussion or modification during the 1988 negotiations.

Articles 6.7, 9.3(e) and the provisions of Exhibit B of the 1988 Agreement form the primary basis for most of the issues presented in the Phase One trial. Those provisions will be discussed in detail later in this Order.

---

**6.** It is unlikely that Stages Three, Four, Five or Six will ever be built, with the possible exception

of the Tucson terminal storage. (Tr. 8/4/98 (Clark) at 110).

## F. The 1994–95 Negotiations to Increase the Ceiling

The 1988 Agreement provided for consultation with CAWCD if it was determined that construction costs for Stages One and Two would exceed the repayment ceiling. (Exhibit B, Art. 9.3(e)). Should Reclamation determine that construction costs would exceed the contract's ceiling, continuation of construction was contingent "upon the execution of an amendatory contract to cover the increased repayment obligation." (Exhibit B, Art. 9.3(e)).

Reclamation agreed during the 1988 negotiations not to obligate funds in excess of the repayment ceiling without prior approval from CAWCD. (Exhibit G).

Reclamation first learned that reimbursable costs were likely to exceed the repayment ceiling as early as 1991. (Tr. 8/6/98 (Newman) at 417–18). According to the testimony of John Newman, the Reclamation official responsible for administering the 1988 Agreement: "Several times I voiced concern that we were running—Reclamation was running the risk of incurring reimbursable costs that were at or near [the] repayment ceiling that was in the Master Repayment Contract." . (*Id.* at 418).

Reclamation did not notify CAWCD in 1991 that reimbursable costs would likely exceed the repayment ceiling. (*Id.* at 418).

CAWCD became concerned that construction costs might exceed the repayment ceiling as a result of replacement and repair of the CAP siphons in late 1991 and expressed its concerns to Reclamation in a letter dated November 1, 1991. (Exhibit J). Reclamation did not respond to this letter.

On August 26, 1993, CAWCD again expressed concerns to Reclamation relative to the repayment ceiling: "It seems that CAP construction costs have significantly exceeded what was anticipated in 1988." (Exhibit K). The August 26, 1993 letter further stated that "pending [an agreement to increase the repayment ceiling], we consider any expenditures which would otherwise have the effect of increasing CAWCD's repayment obligation beyond $1.781 billion, to be outside of the coverage of the [1988 Agreement] and therefore not eligible for inclusion in our repayment agreement." (Exhibit K).

On September 30, 1993, Reclamation notified CAWCD in writing that Stage One of the CAP was substantially complete. (Exhibit L). This initiated CAWCD's repayment obligation for Stage One, with the first scheduled payment due on January 15, 1994. (Exhibit B, Art. 9.4(a); Exhibit L).

Also in the September 30, 1993 letter, Reclamation notified CAWCD that reimbursable costs were estimated. to exceed CAWCD's repayment ceiling. (Exhibit L). This was the first notice from Reclamation to CAWCD that construction costs might exceed the repayment ceiling in the 1988 Agreement. Reclamation estimated reimbursable costs for Stages One, Two and Three to be $2.203 billion. (Exhibit L). This estimate exceeded CAWCD's interpretation of the ceiling for these three stages ($1.871 billion, or $1.781 billion for Stages One and Two plus $.090 billion for Stage Three), as well as the United States' interpretation of the relevant ceiling ($2,090,000,-000). Stage Three (the Tucson terminal storage) has not been constructed and it is not clear whether it will be constructed.

On November 18, 1993, CAWCD acknowledged that it was willing to enter into negotiations "to consider repayment of the cost overrun." (Exhibit M). Negotiations to increase the repayment ceiling began in January of 1994 and continued through June of 1995. Construction of the CAP continued unabated during this period.

Negotiations between CAWCD and Reclamation produced an Agreement in Principle, which included a proposed repayment ceiling of $1.925 billion. June 9, 1995 was chosen as the date for the signing ceremony. However, there were still several disputed collateral issues that needed to be addressed before the signing ceremony.

The negotiations culminated on June 6, 1995 in a "marathon negotiating session" that lasted until 3:00 a.m. the following morning. The negotiators were trying to reach an agreement on several matters unrelated to the repayment ceiling prior to the June 9, 1995 signing ceremony of the Agreement in Principle.

One collateral issue was paragraph 2(c) of the Agreement in Principle. Paragraph 2(c) permitted CAWCD to sell CAP water not reserved for Federal purposes subject to the approval of the Secretary of the Interior. (Exhibit 246 at 11). The "final draft" of the Agreement in Principle, dated May 26, 1995, included paragraph 2(c) with the following parenthetical note:

The United States has not made a final determination regarding the acceptability of subparagraph c above. The United States is considering whether this subparagraph should be more pro-active with respect to the rights of Indian tribes or the United States to participate as buyers in the transfer or assignment of non-Federal water. Previous versions of the Agreement in Principle contained more pro-active language. CAWCD maintains that in light of new language in paragraph 8, the pro-active language contained in previous drafts is inappropriate. CAWCD believes that the language in subparagraph c above does not limit the right of Tribes or the United States to participate in such transactions.

(Exhibit 246 at 11).

Paragraph 2(c) continued to be a contested issue. CAWCD wanted more autonomy and management over CAP water by having the authority to transfer or assign non-Federal water. (Tr. 8/7/98 (Johnson) at 524–25, 553). The Indian tribes, however, also wanted the right to participate in the transfer or assignment of STNL non-Federal water and the federal negotiating team was unwilling to agree to any language that might exclude the Indian tribes or the United States from participating as buyers of non-Federal water. (*Id.* at 525–26, 554).

During the marathon negotiating session, paragraph 2(c) was the subject of much discussion. Robert Johnson testified that the negotiators agreed on a compromise version of the Agreement in Principle in which paragraph 2(c) was removed from the Agreement altogether.[7] (*Id.* at 530–532). A copy of the redacted version of the Agreement in Principle was not offered into evidence.

On June 8, 1995, the CAWCD Board of Directors approved a final redline version of the Agreement in Principle that included paragraph 2(c) as it appeared on June 6, 1995 without the parenthetical note. (Exhibit 43a; Exhibit 248; Tr. 8/7/98 (Johnson) at 532–33; Duffy Dep. of 6/19/97 ("Duffy Dep.") at 68–70).

Secretary Babbitt did not sign the Agreement in Principle. Political pressure from Nevada and California, as well as from several CAP Indian tribes seemingly contributed to his decision not to sign. However, the dispute over paragraph 2(c) also contributed to the failure of the parties to execute the Agreement in Principle. As a result, the parties did not execute the Agreement in Principle.

Despite cost allocation studies showing reimbursable costs exceeding the repayment ceiling, Reclamation continued ahead with construction in the belief that negotiations with CAWCD would result in an agreement to increase the repayment ceiling sufficient to cover the cost overruns. The decision to continue with construction in the absence of a contract to cover the increased repayment obligation was Reclamation's.

On September 30, 1996, Reclamation notified CAWCD that Stage Two was substantially complete and that total reimbursable costs for Stages One and Two were estimated at $2.380 billion. (Exhibit 260).

After CAWCD and Reclamation failed to execute the Agreement in Principle, Reclamation continued incurring reimbursable construction costs which, according to Reclamation's interim cost allocation studies, exceeded CAWCDs' repayment obligation and the contract ceiling. Reclamation eventually cut back expenditures for discretionary work and focused its efforts on public health and safety concerns. (Tr. 8/6/98 (Burbey) at 374).

Although CAWCD officials did not want construction to stop, CAWCD never told Reclamation to go ahead with construction regardless of the cost. (Tr. 8/5/98 (Clark) at 198). CAWCD never encouraged Reclamation to incur construction costs in excess of the repayment ceiling prior to amending the 1988 Agreement. In fact, CAWCD expressly

---

7. Ken Maxey has a different recollection of events. (Tr. 8/5/98 (Maxey) at 244–245).

instructed Reclamation officials on at least two occasions not to exceed the repayment ceiling. (Tr. 8/11/98 (Goddard) at 597–98).

On August 26, 1993, CAWCD informed Reclamation that it considered any expenditures over $1.781 billion "not eligible for inclusion in our repayment agreement." (Exhibit K). Similarly, Sam Goddard, former Governor of Arizona and President of CAWCD in 1993–94, conveyed CAWCD's concerns about Reclamation exceeding the repayment ceiling to the CAP Oversight Committee in December of 1993:

> The concerns about Federal expenditures exceeding the repayment obligation or the authorized project ceiling—project cost ceiling are important financial issues for the United States. CAWCD does not expect nor want the Bureau of Reclamation to exceed these spending limits. We support their efforts to properly identify these limits and encourage them to stop incurring construction obligations if necessary.

(Exhibit 211 at 87).

In the absence of an executed amendatory contract increasing CAWCD's repayment ceiling, the ceiling established in the 1988 Agreement (whether $1.781 billion or $2.0 billion) fixed CAWCD's maximum repayment obligation unless general principles of contract interpretation or equitable principles require CAWCD to pay an amount in excess of the contract ceiling.

## DISCUSSION

### A. Determining the Repayment Ceiling

The 1988 Agreement is a government contract and federal law governs its interpretation. *United States v. Seckinger,* 397 U.S. 203, 209–10, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970) (federal law controls interpretation of contract entered into pursuant to federal law with United States); *O'Neill v. United States,* 50 F.3d 677, 682 (9th Cir.1995), *cert. denied,* 516 U.S. 1028, 116 S.Ct. 672, 133 L.Ed.2d 521 (1995). "Federal law" includes legislation enacted by Congress as well as federal common law. *Kennewick Irrigation*

*Dist. v. United States,* 880 F.2d 1018, 1031 (9th Cir.1989); *Public Agencies Opposed to Social Security Entrapment v. Heckler,* 613 F.Supp. 558, 569 n. 21 (E.D.Cal.1985), *rev'd on other grounds,* 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986). Guidance is also gained from general principles of contract interpretation. *Saavedra v. Donovan,* 700 F.2d 496, 498 (9th Cir.1983).

The Court's role in interpreting a contract is to effectuate the mutual intent of the contracting parties. A court should first look to the four corners of the contract to ascertain the intent of the contracting parties. If the contract's language is clear and unambiguous on its face, the intent of the parties is most readily ascertained from simply reading the contract.

However, the inquiry is not strictly limited to the contract's four corners. Under the Uniform Commercial Code, evidence of prior dealings, usage, and performance is also relevant to the threshold determination whether the contract is ambiguous. U.C.C. § 2–202(a); *O'Neill,* 50 F.3d at 684 (quoting *Nanakuli Paving & Rock Co. v. Shell Oil Co.,* 664 F.2d 772, 783 n. 16 (9th Cir.1981)).[8] The U.C.C. is a source of federal common law and may be relied upon in interpreting a contract to which the federal government is a party. *O'Neill,* 50 F.3d at 684.

Whether the terms of a contract are ambiguous is a question to be decided by the court as a matter of law. *Carpenters Pension Trust Fund v. Underground Constr. Co.,* 31 F.3d 776, 778 (9th Cir.1994); *State Farm Mut. Auto. Ins. Co. v. Fernandez,* 767 F.2d 1299, 1301 (9th Cir.1985). The fact that parties may disagree about a contract's meaning does not necessarily make the contract ambiguous. *International Union of Bricklayers & Allied Craftsman Local No. 20 v. Martin Jaska, Inc.,* 752 F.2d 1401, 1406 (9th Cir.1985). To be ambiguous, the terms of the contract must be susceptible to two different and reasonable interpretations,

---

8. This is a significant change from the common law parol evidence rule. As the Official Comment to § 202 states:

This section definitely rejects ... [t]he [common law] requirement that a condition precedent to the admissibility of the type of evidence specified in paragraph (a) is an original determination by the court that the language used is ambiguous.

U.C.C. § 2–202, Official Comment § 1(c).

each of which is consistent with the language of the contract as a whole. *Kennewick Irrigation Dist.*, 880 F.2d at 1032 (citing *Castaneda v. Dura–Vent Corp.*, 648 F.2d 612, 619 (9th Cir.1981)); *Tzung v. State Farm Fire & Cas. Co.*, 873 F.2d 1338, 1340–41 (9th Cir.1989) (interpretation of contract cannot be strained or absurd).

 A contract must be construed in its entirety, rather than from reading one provision in isolation from the rest of the contract. *Kennewick Irrigation Dist.*, 880 F.2d at 1032 ("A written contract must be read as a whole and every part interpreted with reference to the whole.") (quoting *Shakey's Inc. v. Covalt*, 704 F.2d 426, 434 (9th Cir.1983)). A court should construe a contract in a manner that gives full meaning and effect to all its provisions and avoid an interpretation which leaves part of the contract meaningless or unreasonable. *Id.* Preference is given to reasonable interpretations as opposed to those which are unreasonable or that would make the contract illusory. *Id.*

The United States contends that Article 9.3(e) of the 1988 Agreement plainly and unambiguously establishes the applicable repayment ceiling. Article 9.3(e) provides, in pertinent part, that:

> In the event that the project ultimately consists only of the water supply system, New Waddell Dam, and Modified Roosevelt Dam, the Contractor's actual repayment obligation shall be limited to $2.0 billion.

(Exhibit B, Art. 9.3(e)).

When this language is considered in isolation from the rest of the contract, it is difficult to challenge the United States' contention that Article 9.3(e) fixes the repayment ceiling for Stages One and Two at $2.0 billion.

CAWCD, however, argues that a second provision in the 1988 Agreement conflicts with Article 9.3(e) and precludes the interpretation urged by the United States. CAWCD contends that a review of Exhibit B

to the 1988 Agreement belies any notion that the parties in 1988 intended to impose a fixed repayment ceiling in Stages One and Two, because it reveals that the ceiling was subject to change subsequent to the execution of the 1988 Agreement.

Exhibit B is expressly incorporated into the 1988 Agreement. It reads as follows (numbers shown are in billions of dollars):

| | |
|---|---|
| Amount allocable to CAWCD repayment ceiling based on October 1988 prices. | $1.681 |
| Inflation (4%) on features remaining to be completed, plus an amount for unforeseen contingencies (.82 of the inflation component) | $ .100 |
| Additional costs which could be allocated to CAWCD if the Gila River Indian Community [GRIC] does not take CAP water | $ .259 |
| Total | $2.040 |
| Rounded | $2.000 |

(Exhibit B)

The first column of numbers on Exhibit B breaks down the $2.0 billion repayment ceiling identified in Article 9.3(e) and shows how the number originated. CAWCD's witnesses testified that $1.681 billion represents CAWCD's expected repayment obligation and is derived from Reclamation's 1987 cost allocation. (Tr. 8/4/98 (Clark) at 81; Exhibit I at CAWCD015704). $.100 billion represents inflation and unforeseen contingencies on the remaining features in Stages One and Two which are left to be constructed.[9]

The pivotal language on Exhibit B, CAWCD urges, is the language referring to the GRIC's decision to take CAP water.[10] CAWCD contends that this language creates an adjustable repayment ceiling. According to CAWCD's reading of Exhibit B, the repayment ceiling for Stages One and Two would be $2.0 billion so long as the GRIC did not sign a water delivery contract. If, however, the GRIC later signed a CAP contract, then the $.259 billion figure is removed from the equation, resulting in a ceiling of $1.781 billion.

---

9. Because construction of the water supply system was nearly complete, the $.100 billion was intended primarily for unforeseen contingencies that might arise during construction of the New Waddell and Modified Roosevelt Dams. (Tr. 8/4/98 (Clark) at 81–82).

10. "To take" in this context means to sign a water delivery contract for CAP water with the Secretary, even though the GRIC may not actually use its allocation of water for several years.

In the Court's opinion, interpreting the 1988 Agreement as establishing a variable repayment ceiling is consistent with the overall language, structure and organization of Exhibit B. Exhibit B *identifies* a baseline repayment ceiling for each of the six construction stages.[11] This is an amount derived from cost allocation studies. For Stages One and Two, that ceiling is $1.681 billion. Each stage also has a second amount which represents inflation and unforeseen contingencies. For the first two stages, that amount is $.100 billion. The relevant amounts attributable to each stage are shown below (in billions of dollars):

| | Stages I and II | Stage III | Stage IV | Stage V | Stage VI |
|---|---|---|---|---|---|
| Baseline Ceiling | $1.681 | $.058 | $.060 | $.035 | $.100 |
| Inflation | $ .100 | $.032 | $.035 | $.047 | $.133 |

For Stages Three through Six, the total repayment ceiling is ascertained by adding the baseline ceiling to the amount representing inflation and unforeseen contingencies, as illustrated below:

| | Stages I and II | Stage III | Stage IV | Stage V | Stage VI |
|---|---|---|---|---|---|
| Baseline Ceiling | $1.681 | $.058 | $.060 | $.035 | $.100 |
| Inflation | $ .100 | $.032 | $.035 | $.047 | $.133 |
| Total | N/A | $.090 | $.095 | $.082 | $.233 |

The above analysis applies only to Stages Three through Six. Applying this same analysis to Stages One and Two should result in a total repayment ceiling of $1.781 billion. However, the total identified on Exhibit B is substantially greater: $2.040 billion.[12] This is because for Stages One and Two the first column includes a third number, $.259 billion, as part of the repayment ceiling. It is only by adding this third number to the other two numbers that the pre-rounded total ceiling of $2.040 billion is achieved:

| | Stages I and II |
|---|---|
| Baseline Ceiling | $1.681 |
| Inflation | $ .100 |
| Other | $ .259 |
| | $2.040 |

None of the other stages' ceilings includes a third number.

The third number represents "additional costs which could be allocated to CAWCD if the Gila River Indian Community does not take CAP water." This description is significant. $.259 billion is described as "additional costs," meaning that it is not part of the baseline ceiling or attributable to inflation or unforeseen contingencies. At the time the 1988 Agreement was executed, it was not known whether the GRIC would take its allotment of 173,100 acre-feet of CAP water. If the GRIC ultimately did not take its share, the water most likely would have been reallocated to CAWCD, resulting in a substantial increase in CAWCD's repayment obligation.[13] The cost of this water was estimated to be $.259 billion.

The baseline ceiling identified on Exhibit B does not reflect the possibility that CAWCD's costs might substantially increase as a result of GRIC's refusal. In fact, it was calculated under the assumption that the GRIC would eventually sign a CAP contract. The $ .259 billion number is therefore included on Exhibit B to represent the additional costs to CAWCD should this assumption prove false.

The words "*could*" and "*if*" used in Exhibit B further reflect this uncertainty. $.259 billion *could* be included in the total repayment ceiling, but *only if* the GRIC did *not* take CAP water; otherwise, the ceiling would not include this amount. The language is conditional, suggesting that the parties intended to have two alternate repayment ceilings for Stages One and Two: one if the GRIC took CAP water and a second if it did not.

It is undisputed that the GRIC signed a water delivery contract with the Secretary on October 22, 1992 for 173,100 acre-feet of water. CAWCD interprets this event as triggering an automatic adjustment in the

11. In employing the phrase "baseline repayment ceiling," the Court is referring to the repayment ceiling that is identified in the first row of numbers on Exhibit B, which does not include any consideration of inflation or unforeseen contingencies.

12. It is not known why this amount was rounded down to $2.0 billion.

13. Allocation of this water to CAWCD would enable it to sell the water to M & I purchasers. This explains the increased cost to CAWCD in the event the GRIC did not sign a water delivery contract.

repayment ceiling stated in Article 9.3(e) from $2.0 billion to $1.781 billion. The United States, on the other hand, argues that the repayment ceiling remained fixed at $2.0 billion even after the GRIC executed its water delivery contract.

Herein lies the ambiguity in the 1988 Agreement. Article 9.3(e) imposes what appears to be a single, unqualified $2.0 billion ceiling for Stages One and Two. In contrast, Exhibit B, as discussed *supra*, appears to establish a variable repayment ceiling which is $1.781 billion where the GRIC has executed a water delivery contract. The conflict between these two contract provisions arguably renders the 1988 Agreement ambiguous.

The United States, however, contends that there is no ambiguity in the 1988 Agreement because Exhibit B bears no relevance in determining the repayment ceiling for Stages One and Two. The United States advances several arguments attempting to show that Exhibit B is not relevant. The Government argues that Exhibit B was incorporated into the 1988 Agreement only in regard to the stages subsequent to Stages One and Two and therefore has no application to Stages One and Two. To the extent that Exhibit B is deemed pertinent to Stages One and Two, the United States argues that the only relevant number is the $2.0 billion rounded total that is located at the bottom of the first column, because it corroborates the unambiguous ceiling that is identified in Article 9.3(e). The United States apparently considers the rest of the numbers in the first column (*i.e.,* the numbers showing the source of the $2.0 billion repayment ceiling) immaterial and contends that they should be ignored by the Court.

The United States maintains that CAWCD places too great an emphasis on the actual description provided in Exhibit B. According to the United States, Exhibit B identifies only "one possible set of assumptions, among an infinite number, that justifies the $2.0 billion ceiling in article 9.3(e)." Apparently, the $.259 billion could be used as "additional breathing room" or a "cushion" for Reclamation in the event that construction costs unexpectedly exceeded the repayment obligation. The United States argues that the $.259 billion could also be used for any unforeseen contingencies which might arise during construction, in addition to the $.100 billion which was already set aside to cover unforeseen contingencies.

These explanations are unpersuasive. Plainly, Exhibit B is an integral part of the 1988 Agreement and the Court rejects the theory that it was only intended to be partially incorporated into the contract. Although Article 9.3(e) expressly refers to Exhibit B only in the context of Stages Three through Six, a substantial portion of Exhibit B is dedicated to Stages One and Two. To simply declare this part of Exhibit B irrelevant, as the United States urges, would be to render the bulk of Exhibit B surplusage and would make its attachment to the 1988 Agreement virtually meaningless. This would violate a cardinal rule of contract construction. *See Kennewick Irrigation District,* 880 F.2d at 1032 (courts should avoid interpretation that leaves part of a contract illusory).

The United States essentially asks the Court to ignore anything on Exhibit B that would cast doubt on its interpretation of Article 9.3(e) of the 1988 Agreement. Thus, the rounded total of $2.0 billion is relevant, but the other numbers ($1.681 billion, $.100 billion, $.259 billion and $2.040 billion) are not. This does not clarify the ambiguity created by the inclusion of both provisions in the 1988 Agreement, it simply ignores it.

Article 9.3(e) and Exhibit B are both part of the 1988 Agreement and therefore both must be considered when interpreting the repayment ceiling established by the 1988 Agreement. That the two provisions conflict with one another does not by itself provide a reasonable basis for rejecting one provision in favor of the other. Rather, it directs a conclusion that the contract is ambiguous.

The Court rejects the United States' contention that Exhibit B "does not mean what it says." The wording in Exhibit B regarding the GRIC was originally drafted by the United States and remained unchanged in the final version of Exhibit B. Considering the sophistication of the parties, the Court concludes that neither the United States nor CAWCD would have attached something to the 1988 Agreement which was not intended to influence the contract's meaning. The mathematical breakdown of the repayment

ceiling was thoughtful and deliberate, not random and fortuitous as the United States claims.

The United States contends that, if an ambiguity exists, the Court should consider CAWCD's actions subsequent to executing the 1988 Agreement. *O'Neill,* 50 F.3d at 684. The United States argues that CAWCD's conduct from 1988 to 1993 was inconsistent with its present interpretation of the contract's ceiling provisions, and reveals that CAWCD considered the ceiling to be $2.0 billion until serious financial problems motivated CAWCD in 1993 to re-interpret the ceiling as $1.781 billion. Accordingly, the United States argues, CAWCD's conduct resolves any possible ambiguity that might otherwise have been created by the inclusion of Exhibit B as a part of the 1988 Agreement.

At first glance, the evidence appears to provide some support for the United States' argument. Statements and actions attributed to CAWCD between December 1, 1988 and October 22, 1992 suggest that the District interpreted the repayment ceiling as $2.0 billion during that time frame. However, this evidence loses its significance when it is considered that, because the GRIC had not yet signed its water delivery contract, the repayment ceiling *was* $2.0 billion during that period of time. Consequently, CAWCD's conduct from 1988 to 1992 was not inconsistent with its present interpretation of the ceiling provisions of the 1988 Agreement.

Likewise, the Court does not find support for the United States' position in CAWCD's conduct after October 22, 1992 (the date of the execution of the GRIC Agreement). The United States contends that CAWCD failed to notify Reclamation for nearly ten months after the signing of the GRIC contract that it believed the repayment ceiling had been reduced to $1.781 billion, and that this failure on the part of CAWCD demonstrates that CAWCD first re-interpreted the ceiling provision in August of 1993, motivated by an adverse financial situation. The evidence, however, provides little support for this contention.

The United States offered only one exhibit at trial in support of this contention: a draft of a document dated February 23, 1993 purporting to provide a brief financial history of

CAWCD (Exhibit 148). The document, entitled "Financial History of the District", contains the following sentence: "The Master Repayment Contract limits the District's repayment obligation to $2.0 billion for the water system, New Waddell Dam and the modified Roosevelt Dam." (*Id.* at 1). The document, however, is of limited probative value. It remained in draft form as a memo to the file and was never issued as a formal statement. Moreover, the individual who prepared the document testified in his deposition that at the time he drafted the document he believed that the GRIC had not signed a contract to take CAP water.

■ The United States contends that the $1.781 billion figure was first used in an August 4, 1993 memorandum from Grant Ward to the CAWCD Board of Directors— nearly ten months after the GRIC signed a water delivery contract. (Exhibit 196). The United States argues that the unexplained failure of CAWCD staff members to brief the Board of Directors earlier about a substantial decrease in the repayment ceiling lends substantial credence to its theory that CAWCD only began interpreting the ceiling as $1.781 billion in August of 1993. The Court remains unpersuaded.

In fact, CAWCD's allegedly "new" interpretation of the repayment ceiling actually surfaced several months earlier. A March 18, 1993 Bond document included the following statement:

> Under its interpretation of the Master Repayment Agreement, the District estimates its repayment obligation to be approximately $1.8 billion for the water supply system, New Waddell Dam, Modified Roosevelt Dam and Tucson Terminal Storage. The District's estimate is based on ... a determination by the District that the execution of a CAP water delivery contract by the GRIC reduces the Base Repayment Ceiling by $.259 billion.

(Exhibit 180 at E–6).

The above statement was issued just four months after the GRIC executed its water delivery contract and appears to be CAWCD's first public statement regarding the repayment ceiling after October 22, 1992. This statement corroborates Goddard's testi-

mony that he was advised about the ceiling being less than $2.0 billion sometime between October 22, 1992 and August 4, 1993, although he could not remember the precise date.[14] (Tr. 8/7/98 (Goddard), at 595). The statement also contradicts the assertion that CAWCD re-interpreted the repayment ceiling in August of 1993 in response to financial problems.

In essence, the United States is arguing that CAWCD's failure to vocalize its interpretation of the repayment ceiling earlier constitutes a "course of performance" under U.C.C. § 2–202(a), and that this alleged course of performance is inconsistent with CAWCD's "later" interpretation of the repayment ceiling as being $1.781 billion. The Court finds that the weight of the evidence does not support the United States' "course of performance" contentions. CAWCD's failure to immediately notify Reclamation that it believed that the repayment ceiling had been reduced to $1.781 billion is not inconsistent with its interpretation of the repayment ceiling. According to evidence produced by CAWCD, both sides were aware that the execution of a water delivery contract by the GRIC would result in an adjustment in the repayment ceiling. Consequently, there was no reason to advise Reclamation of the "new" ceiling.

Having determined that the language in the 1988 Agreement relating to the repayment ceiling is subject to two different interpretations, the Court will resort to extrinsic evidence in order to resolve the ambiguity. *Clardy Manufacturing Co. v. Marine Midland Business Loans Inc.*, 88 F.3d 347, 352 (5th Cir.1996); *In re Kaiser Steel Corp.*, 998 F.2d 783, 789 (10th Cir.1993). The interpretation of the contract at this point becomes a question of fact. *Metropolitan Paving Co. v. City of Aurora, Colorado*, 449 F.2d 177, 181 (10th Cir.1971). As the Tenth Circuit noted in *Metropolitan Paving:*

> [O]nce it has been determined that an ambiguity exists, and where the construction to be given a contract depends upon extrinsic facts and circumstances, then the terms of the contract are generally issues of fact—not law—and as such are to be

determined in the same manner as other disputed factual issues, *i.e.*, by either a jury or, as in the instant case, by the trial court sitting without a jury.

*Id.*

■ Before considering any extrinsic evidence of the parties' intent, the Court must determine whether the rule of *contra proferentem* applies in this case. This rule provides that ambiguous language in a contract should be strictly construed against the drafter. *See Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1048 (9th Cir.1995) (quoting *Taylor–Edwards Warehouse & Transfer Co. v. Burlington N., Inc.*, 715 F.2d 1330, 1334 (9th Cir.1983)). The United States prepared the original draft of Exhibit B. (Exhibit 27; Tr. 8/6/98 (Burbey), at 385). Subsequent drafts of Exhibit B resulted in only minor, non-substantive changes to the document. The final version of Exhibit B was identical in substance to the original draft. The numbers and language, including the language regarding the GRIC, did not change. Accordingly, any ambiguity resulting from Exhibit B should be strictly construed against the United States.

The United States, however, offers two reasons why the Court should disregard the *contra proferentem* rule in this case: any ambiguity is a "patent ambiguity," properly construed against CAWCD; and "CAWCD staff members participated to such an extent in the underlying analysis that it was considered a 'joint effort.'" (*United States Post Trial Findings of Fact*, at 24).

Addressing the latter argument first, the Court finds no merit to the characterization of the preparation of Exhibit B as a "joint effort." Assuming that CAWCD staff members contributed to the underlying analysis, these staff members did not draft Exhibit B. They did not choose the language principally at issue here concerning the GRIC or arrange the numbers on the exhibit. The United States was solely responsible for the language and composition of Exhibit B.

---

14. Goddard, a former Governor of Arizona, was president of CAWCD from 1993–94. He has

been on the Board of Directors since 1986.

■ Nor does the Court agree that the ambiguity in this case is patent. The patent ambiguity rule states that if there is a patent ambiguity in the contract, *i.e.*, a discrepancy which is obviously apparent to a reasonably prudent party, a duty arises on the non-drafting party to inquire as to the meaning of the conflicting provisions. *See Crown Laundry and Dry Cleaners, Inc. v. United States*, 29 Fed.Cl. 506, 517 n. 3 (1993). "What constitutes the type of ambiguity sufficient to obligate plaintiff to make an inquiry, however, can be defined 'only on an *ad hoc* basis by looking to what a reasonable man would find to be patent and glaring.'" *Cherry Hill Sand & Gravel Co. v. United States*, 8 Cl.Ct. 757, 763 (1985).

The United States' patent ambiguity theory is based solely on the testimony of Chris Gehlkar, who was concerned that the language in Exhibit B relating to the GRIC did not fully embody everything that had been agreed to by the parties during a prior negotiating session. (Tr. 8/6/98 (Gelhkar) at 432–33). The United States contends that Gelhkar's concern shows that the ambiguity is patent.

The Court does not agree. Although the language in Exhibit B was not satisfactory to Gehlkar's liking, it was not patently ambiguous. Gehlkar did not testify that the language was confusing, or that it clouded his understanding of the repayment ceiling provisions, or that he did not understand its meaning. Gehlkar's concern was only that the language "didn't fully express what we'd agreed to." (Tr. 8/6/98 (Gehlkar) at 433). This does not amount to a patent ambiguity.

The conflict between Article 9.3(e) and Exhibit B did not become apparent until after the GRIC executed its water delivery contract. Prior to that, the repayment ceiling was $2.0 billion, regardless whether it was fixed or variable. Until October 22, 1992, CAWCD had no reason to suspect that the United States had a different interpretation of Exhibit B. As CAWCD points out in its post-trial memorandum, it is possible to reconcile the two provisions:

The $2.0 billion figure in Article 9.3(e) . . . is preceded by the word "limit;" it is an "up to" figure or an outer limit depending on what happens with the GRIC water. Its use in Article 9.3(e) reflects this "limit-ing" concept and also reflects the actual state of affairs when the contract was executed in 1988.

*CAWCD's Post–Trial Brief,* at 5. (Dkt.338).

The conflict between Article 9.3(e) and Exhibit B is not a patent ambiguity, and no justification exists for construing the ambiguity against CAWCD. The rule of *contra proferentem* therefore requires that the ambiguity be construed strictly against the United States.

Applying that rule here, the Court concludes that the 1988 Agreement created a variable repayment ceiling for Stages One and Two. The ceiling's upper limit, as specified in Article 9.3(e) of the contract, was $2.0 billion. $2.0 billion, however, was not the only possible repayment ceiling for Stages One and Two. It is apparent from the language of Exhibit B that the $2.0 billion ceiling was conditioned upon the GRIC not executing a water delivery contract with the Secretary. If the GRIC later signed a water delivery contract, as it ultimately did, the costs associated with that water would not be calculated into the repayment ceiling for Stages One and Two and the repayment ceiling would become $1.781 billion.

Even if the *contra proferentem* rule did not apply in this case, the clear weight of the evidence presented at trial favors CAWCD's interpretation of the repayment ceiling. It is evident from a review of the extrinsic evidence offered at trial that the parties intended the repayment ceiling for Stages One and Two to be dependent upon the GRIC's decision to take CAP water. If the GRIC signed a water delivery contract, the ceiling would be $1.781 billion. If, however, the GRIC did not sign a water delivery contract, the ceiling would be $2.0 billion.

The first witness whose testimony related to the repayment ceiling dispute was Tom Clark, a primary negotiator for CAWCD during the 1988 negotiations. Clark testified that the parties intended the repayment ceiling to be $1.781 billion once the GRIC signed a contract for CAP water. (Tr. 8/4/98 (Clark) at 85, 89). Clark testified that it was not CAWCD's intention at the time of the 1988 negotiations to pay more than $1.781

billion if the GRIC took CAP water. (*Id.* at 96).

Clark's testimony is corroborated by the testimony of several other witnesses. Larry Dozier, who was the assistant general manager of CAWCD during the 1988 negotiations, testified that his understanding with respect to the contract ceiling was that the 1988 Agreement provided for two alternative situations regarding the repayment ceiling for Stages One and Two:

> In the first alternative, the ceiling would be limited to—the repayment obligation would be limited to 2 billion if in fact the GRIC did not sign the contract and take their allocation of 173,100 acre feet of water; but provided for that in the event they did sign that contract, it would establish a ceiling of 1.781 billion dollars.

(Tr. 8/5/98 (Dozier) at 205).

Dozier introduced one of the key principles underlying CAP cost allocation: "If CAWCD doesn't get the water, they don't get the cost." (*Id.* at 227). In other words, the costs associated with a specific allocation of water followed the water. Dozier further elaborated on this point:

> The original cost allocation . . . was done with the assumption in it that the water would be contracted for and used by the Gila River Indian Community, the 173,100 acre feet that they had been allocated, but had not yet signed the contract for.
>
> The original study assumed that they would use it upon—and that arrived at the number of approximately 1.681.
>
> Upon further review and upon the realization that they had not yet signed the contract, although it had been offered to them eight years prior to that time, in an attempt to see what additional costs might be moved to CAWCD, if in fact that contract was never signed, there was sort of a proportional proration done, looking at the water supply cost allocation that said, 'Gosh, if we move this amount of water away from the Indian use column and put it over into the non-Indian agricultural use

column, it should take about this many costs with it.'
>
> So [the $.259 billion] was a reasonable approximation of the cost that would be moved, associated with that water.

(*Id.* at 225–26).

Another member of the CAWCD negotiating team in 1988 was Chris Gehlkar. Gehlkar testified that it was agreed to by both sides during the negotiations that CAWCD's repayment ceiling would be $1.781 billion unless the GRIC decided not to take CAP water. (Tr. 8/6/98 (Gehlkar) at 430, 444–46). Gehlkar also testified that the parties had agreed that any water which was not allocated to the GRIC would be reallocated to CAWCD and that this is what was meant by the phrase "not take CAP water." (*Id.* at 433). Thus, the GRIC refusal would result in additional cost to CAWCD.

CAWCD's interpretation of the repayment ceiling is further corroborated by the testimony of former Reclamation and Interior officials. During the 1988 negotiations, Ken Maxey monitored the negotiations on behalf of Assistant Secretary James Ziglar and regularly reported back to him on the progress of negotiations. (Maxey Dep. of 5/31/96 ("Maxey Dep.") at 18–19) Maxey testified that the effect of the $.259 billion provision was to decrease CAWCD's repayment ceiling should the GRIC sign a contract for CAP water.[15] (*Id.* 40–41). Maxey, who worked for Reclamation as a contract and repayment specialist for eleven years, interpreted the repayment ceiling as being $1.781 billion assuming the GRIC signed a water delivery contract for their full allotment of CAP water. (*Id* at 24–26).

Maxey's interpretation of the repayment ceiling is consistent with his notes from a February 1988 negotiating session. (Exhibit 26). The notes reflect that one of the key issues discussed during that session was "the potential transfer of water and the associated repayment obligation if the Gila River Indian

---

**15.** There is some dispute as to the relevance of Maxey's opinion. The United States contends that Maxey did not prepare Exhibit B and was not present at the time the 1988 Agreement was finally consummated. The Court notes, however, that Maxey regularly monitored the negotiations

for Secretary Ziglar. His notes reflect that he was present during early discussions regarding the GRIC's decision whether to sign a CAP contract on the contract ceiling. (*See* Exhibit 26). His testimony on this issue is clearly relevant.

Tribe does not contract for its CAP allocation of 173,100 acre-feet ($250 million)." (Exhibit 26 at 1). Maxey's notes show that the GRIC's decision to take CAP water would significantly affect CAWCD's repayment obligation, and that the negotiators wanted to take this possibility into consideration in drafting an amendatory contract.[16] Maxey's notes are also consistent with notes taken by "JCK", which also reflect that the "Gila River Indian Refusal" makes up $.250 billion of the ceiling.

James Ziglar, former Assistant Secretary of Water and Science, also testified that the repayment ceiling was intended to be $1.781 billion in the event that the GRIC signed a water delivery contract. (Ziglar Dep. of 10/4/96 ("Ziglar Dep.") at 30). Ziglar executed the 1988 Agreement on behalf of the United States and his understanding of the repayment ceiling is therefore particularly weighty. (Exhibit B at 59; Ziglar Dep. at 23).

Two other Reclamation officials had similar interpretations of the repayment ceiling. Dennis Underwood, Commissioner of Reclamation from 1989 to 1993, and Ed Hallenbeck, Regional Director for the Bureau of Reclamation, each testified that the repayment ceiling would be $1.781 billion if the GRIC executed a water delivery contract for its share of CAP water. (Hallenbeck Dep. of 9/25/96 ("Hallenbeck Dep.") at 91; Underwood Dep. of 10/3/96 ("Underwood Dep.") at 67).

Hallenbeck explained that Exhibit B:

... shows a mechanism by which you arrive at what the maximum possible ceiling could be. If the Indians took the water, you would then relieve C.A.W.C.D. of that repayment component of the $.259 billion ... if the water was no longer there, you could not ... exceed the 1.781 [amount].

(Hallenbeck Dep. at 90, 48–49).[17] Underwood likewise testified that the $.259 billion

would not be included in CAWCD's repayment ceiling if the GRIC took its full share of CAP water. (Underwood Dep. at 65–67).

The United States challenges the relevance of Ziglar, Hallenbeck and Underwood's interpretation of the repayment ceiling. These individuals, it argues, were not present during the 1988 negotiating sessions and their opinions do not represent the official opinion of Reclamation, but are only "personal" opinions.

These individuals were key officials within Reclamation and the Department of Interior at the time the 1988 Agreement was executed and were chiefly responsible for administering the contract. Their understanding of the terms of that contract, therefore, are indeed relevant. The fact that their understanding may not square directly with the theory asserted by the United States in this case does not provide a basis to reject their testimony.

The "official" interpretation of the repayment ceiling was provided by LeGrand Neilson, Robert Johnson, Larry Morton and Steve Hvinden. Each of these witnesses testified that the repayment ceiling was intended by the parties to be fixed at $2.0 billion and there was never any understanding on the part of the of the negotiators that the ceiling could be adjusted downward should the GRIC ultimately decide not to take CAP water. However, as will be discussed, their testimony was far from unequivocal.

LeGrand Neilson was the lead negotiator for the Federal team in 1988. He testified at trial that he understood the repayment ceiling for Stages One and Two to be a fixed $2.0 billion ceiling. (Tr. 8/11/98 (Neilson) at 647–648). Neilson further testified that the $2.0 billion ceiling was derived from adding $1.681 billion, $.100 billion, and $.259 billion together and then rounding the result to $2.0 billion:

---

**16.** The United States highlights the fact that Maxey's notes refer to a $250 million amount, not $.259 billion. (Tr. 8/5/98 (Maxey) at 265). The difference between these two amounts is inconsequential.

**17.** The United States objects to Hallenbeck's testimony on the grounds that he is referring to the repayment *obligation*, not the repayment *ceiling*.

In fact, Hallenbeck uses the terms almost interchangeably. At one point during his deposition, he states that only the repayment obligation would be reduced, but the ceiling "would not change." (Hallenbeck Dep. at 90). However, he later states that the *ceiling* would be $1.781 billion and not $2.0 billion. (Hallenbeck Dep. at 91).

The two billion dollars is made up of the component shown here of 1.681 billion ... 100 million of contingencies, [and] an amount [of $.259 billion] that would be included, in the district's obligation if the Gilas did not sign a repayment contract. (*Id.* at 651).

Removing one of the numbers from this equation obviously changes the result. If $259 billion is taken out of the equation, the new ceiling would be $1.781 billion ($1.681 billion plus $.100 billion). Yet, Neilson maintained that the ceiling would still be $2.0 billion. (*Id.* at 651).

Robert Johnson is currently the Regional Director of Reclamation's Lower Colorado Region. Johnson, like Neilson, testified that the repayment ceiling was $2.0 billion. (Tr. 8/7/98 (Johnson) at 515). Johnson's opinion was based largely on the fact that the 1988 Agreement "makes clear reference" to $2.0 billion. (*Id.* at 581). In the Court's opinion, however, Exhibit B to the 1988 Agreement impliedly refers to a $1.781 billion repayment ceiling. Interpreting the 1988 Agreement as having a fixed $2.0 billion ceiling effectively makes Exhibit B meaningless.

Larry Morton was formerly the Assistant Project Manager for. Reclamation's Arizona Projects Office. Like Neilson and Johnson, Morton also testified that the ceiling for Stages One and Two was fixed at $2.0 billion. (Tr. 8/6/98 (Morton) at 335). According to Morton, the purpose of Exhibit B "was to establish the ceiling for stages one and two, assuming that the Gila River Indian Community did *not* take any water." (*Id.* at 334). Morton, however, maintained that the ceiling remained $2.0 billion even if the GRIC took its full share of CAP water. (*Id.* at 334–35).

Morton did concede that it would not be fair or reasonable to require CAWCD to reimburse the United States for the costs associated with the GRIC's 173,100 acre-feet of water. (*Id.* at 334). The cost of this water was $.259 billion.

But when pressed to explain the $.259 billion figure that appears on Exhibit B, Morton simply dismissed it as immaterial, explaining that the only relevant number in the first column of Exhibit B was $2.0 billion; the rest of the numbers were simply irrelevant. (*Id.* at 335). This does not account for

the $.259 billion figure or explain why the parties attached Exhibit B to the 1988 Agreement. It simply ignores it.

Finally, Steve Hvinden, a member of the federal negotiating team in 1988, testified that the repayment ceiling was $2.0 billion. (Tr. 8/11/98 (Hvinden) at 638). Yet, Hvinden's testimony in the end proved to be largely detrimental to the United States' case-in-chief, as demonstrated by the following exchange:

Q: Now, I think you were asked a hypothetical question in your deposition, and I will ask you that today.

If, at the time of the negotiations, the GRIC had, in fact, executed their contract, what was your opinion as to what the ceiling would have been in the contract? A. Well, I think we would have followed the methodology we were using. It would be 1.781 billion.

(*Id.* at 630).

If signing a water delivery contract prior to December 1, 1988 would have resulted in a $1.781 billion ceiling, it stands to reason that the same would be true if the contract was signed after December 1, 1988. On its face, the wording used in Exhibit B reflects this potential to change.

Like Morton, Hvinden was also asked to account for the $.259 billion provision. Hvinden explained that the $.259 billion was intended to provide "additional breathing room" for Reclamation in case construction costs exceeded the $1.681 billion estimate and the $.100 billion set aside for unforeseen contingencies. (*Id.* at 630, 658). According to Hvinden's interpretation of Exhibit B, the 1988 Agreement provided for $359 million for unforeseen contingencies.

Tom Burbey asserted a similar view regarding the $.259 billion. According to Burbey, the $.100 billion was intended only to cover foreseeable unforeseen contingencies, such as design changes, unusual site circumstances, and "things that would normally be encountered in construction." (Tr. 8/6/98 (Burbey) at 384). By contrast, Burbey testified that the $.259 billion was intended to cover unforeseen contingencies which were not foreseeable, such as the EPA order requiring that scrubbers be added to the Navajo Station. (*Id.* at 384).

Burbey and Hvinden's interpretations of the $.259 billion do not comport with the plain language of Exhibit B. Nor are they very convincing. An unforeseen contingency is, by its very definition, something that occurs which was not foreseen. A "foreseeable unforeseen contingency" is an oxymoron. Moreover, it plainly contradicts the phraseology of Exhibit B and is not supported by any other evidence. In short, it is not credible.

The United States argues that $.100 billion was insufficient to cover potential unforeseen contingencies and that $.359 billion more accurately represents the amount needed for contingencies. Testimony elicited at trial, however, suggests otherwise:

> Q. So that 100 million only relates to the reimbursable portion of the inflation and other contingencies amount, doesn't it?
>
> A. Well, I don't know—I don't know how the 100 million was determined, to be real honest with you.
>
> Q. But if it's a part of the ceiling, then that 100 million—if you relate it to the cost of the—of actually building the water supply system in [N]ew Waddell and modified Roosevelt, that 100 million would really be significantly more, because you divide it by 62 percent, and it would be about 160 million, wouldn't it, in relation to how much room you had to go over the estimate of the cost of building the whole phases— stages one and two. Isn't that right?
>
> A. I—I see what you're getting at, and I think that's probably right, yes.

(Tr. 8/7/98 (Johnson) at 565).

Exhibit B could have been drafted to reflect a repayment ceiling that included $.359 billion in unforeseen contingencies. It was not. Exhibit B also could have distinguished between foreseeable and unforeseeable contingencies. Again, it did not. Instead, the

specific language used in Exhibit B clearly linked the $.259 billion to the GRIC's water delivery contract and set aside only $.100 billion for inflation and unforeseen contingencies. These numbers were negotiated and ultimately agreed upon by both parties. The Court finds no basis for adopting a contrary interpretation.

The United States has not sustained its burden of showing that the parties negotiated a fixed $2.0 billion repayment ceiling. At best, the evidence in support of the Government's interpretation of the repayment ceiling is inconsistent and equivocal.[18]

Conversely, the clear weight of the evidence offered at trial demonstrates that the parties in 1988 intended to create an adjustable repayment ceiling for Stages One and Two of the CAP. Article 9.3(e) identified the ceiling as it existed at the time the 1988 Agreement was executed: $2.0 billion. As reflected on Exhibit B, $.259 billion of this total ceiling represented costs that would be subtracted from the ceiling if GRIC later executed a water delivery contract with the Secretary of the Interior.

After considering all of the extrinsic evidence admitted at trial, including the voluminous exhibits, deposition transcripts, and the testimony of the witnesses who testified at trial, the Court finds that the parties intended to create a variable repayment ceiling in the 1988 Agreement. Because the GRIC executed a water delivery contract with the Secretary, the applicable repayment ceiling is $1.781 billion.

## B. Waiver and Estoppel

Assuming that the cost allocation studies in existence at the time of the Phase One trial are accurate, reimbursable costs for Stages One and Two are estimated to be $2.334 billion.[19] This greatly exceeds the

---

18. The failure to plausibly account for the specific language in Exhibit B is a factor weighing heavily, although not decisively, against the United States' interpretation. Simply dismissing this language as irrelevant, or arguing that it means something other than what it plainly states is insufficient to rebut the presumption of relevance. See MICO, Inc. v. Wagner Electric Corp., 802 F.2d 322, 323 (8th Cir.1986) ("it is presumed that everything in [a] written contract is put there deliberately and for a purpose"); Hettig & Co. v. Union Mutual Life Insurance Co., 781 F.2d

1141, 1144 (5th Cir.1986) ("all language in a contract is presumed to have some meaning").

19. The United States recently revised its cost allocation study, resulting in a reduction in CAWCD's repayment obligation from $2.334 billion to $2.18 billion. Although this most recent cost allocation study reduced CAWCD's reimbursable costs by $150 million, CAWCD argues that the revised cost allocation study continues to overstate allocable costs by more than $350 mil-

$1.781 billion repayment ceiling. The United States argues that CAWCD has waived the repayment ceiling provision and consequently is obligated to repay the United States the full $2 .334 billion. Alternatively, the United States argues that CAWCD is estopped from enforcing the repayment ceiling provision against the United States.

■■■■■ "A waiver is an intentional relinquishment or abandonment of a known right or privilege." *Groves v. Prickett,* 420 F.2d 1119, 1125 (9th Cir.1970). A waiver of rights will be found where there is "clear, decisive and unequivocal" conduct which manifests an intent to waive the legal rights involved. *Id.* at 1125–26. Whether a waiver of a contractual right has occurred is a question of fact and must be established by clear and convincing evidence. *L.K. Comstock & Co. v. United Eng'rs & Constructors Inc.,* 880 F.2d 219, 221 (9th Cir.1989). Waiver is an affirmative defense and the party asserting it carries the burden of proof. Fed.R.Civ.P. 8(c); *Intel Corp. v. Hartford Acc. & Indem. Co.,* 952 F.2d 1551, 1559 (9th Cir.1991).

■■■■■ The doctrine of equitable estoppel is also an affirmative defense that must be proven by the party seeking to invoke it. Fed.R.Civ.P. 8(c); *Continental Airlines, Inc. v. Intra Brokers. Inc.,* 24 F.3d 1099, 1103 (9th Cir.1994). Estoppel, like waiver, is primarily a factual question that must be demonstrated by "clear, convincing, and satisfactory evidence." *Cedar Creek Oil & Gas Co. v. Fidelity Gas Co.,* 249 F.2d 277, 281 (9th Cir.1957). The following four elements are necessary to establish the defense of estoppel:

(1) The party to be estopped must know the facts;

(2) The party to be estopped must intend that its conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;

(3) The party asserting the estoppel must be ignorant of the true facts; and

(4) The party asserting the estoppel must rely on the former's conduct to its injury.

*United States v. Garan,* 12 F.3d 858, 860 (9th Cir.1993); *Morris v. Andrus,* 593 F.2d 851, 854 (9th Cir.1978).

lion. These issues will be explored during Phase Two.

■■■ The United States' claims of waiver and estoppel arise principally from Tom Clark's testimony that he wanted Reclamation to continue construction. The United States also lists the following as examples of waiver:

[M]aking annual requests to Congress for additional Federal appropriations for the construction of the CAP without regard to whether the expenditure of such appropriations would result in reimbursable costs exceeding the repayment ceiling; neither directing nor requesting that Reclamation not exceed the repayment ceiling or stop performance in spite of having concerns that additional work might result in reimbursable costs exceeding the ceiling; negotiating a new repayment contract for a year and a half without ever indicating that lack of funds would preclude increasing the ceiling or that additional funding would not be forthcoming; continuing to perform construction work for which CAWCD is paid out of construction appropriations; assuming full control over all project operations; and accepting the fruits and benefits of all otherwise reimbursable expenditures, including those in excess of the repayment ceiling.

*United States Post Trial Proposed Findings of Fact and Conclusions of Law for Phase One,* at 54.

The United States' claims of waiver and estoppel are factually inaccurate and unsupported by the record as a whole. There is no dispute that the Central Arizona Project is "absolutely essential" to the continued growth and development of Arizona. (Tr. 8/11/98 (Goddard) at 597). Several individuals, Tom Clark among them, recognized the importance of its completion and did not want to see construction unnecessarily delayed. The desire to accomplish the CAP, however, does not equate to urging, inducing, or encouraging Reclamation to ignore the repayment ceiling (whether $1.781 billion or $2.0 billion) and to continue incurring costs which far exceed the ceiling. In fact, the weight of the evidence is to the contrary.

Reclamation agreed that it would "not commit funds over the ceiling without

CAWCD approval." (Exhibit G). Reclamation was aware that reimbursable construction costs would possibly exceed the repayment ceiling as early as 1991, but did not notify CAWCD to begin negotiations for more than two years. CAWCD anticipated this eventuality and expressed its concerns to Reclamation in November of 1991. (Exhibit J). However, Reclamation made no effort to consult with CAWCD at that time.[20]

CAWCD again conveyed its concerns to Reclamation in 1993. In an August 26, 1993 letter to Reclamation, Tom Clark wrote that:

> Please be informed that, pending such an agreement [to increase CAWCD's repayment obligation], we consider any expenditures which would otherwise have the effect of increasing CAWCD's repayment obligation beyond $1.781 billion, to be outside of the coverage of the contract and therefore not eligible for inclusion in our repayment agreement.

(Exhibit K). CAWCD was notifying Reclamation that it had no intention of paying construction costs in excess of the repayment ceiling absent an amendatory agreement. Clark testified that he never told Reclamation to continue with construction over the repayment ceiling. (Tr. 8/5/98 (Clark) at 198).

Goddard reiterated CAWCD's position in a statement before Congress in December of 1993:

> The concerns about Federal expenditures exceeding the repayment obligation or the authorized project ceiling—project cost ceiling are important financial issues for the United States. CAWCD does not expect nor want the Bureau of Reclamation to exceed these spending limits. We support their efforts to properly identify these limits and encourage them to stop incurring construction obligations if necessary. (Exhibit 211 at 85–87).

Clark and Goddard's statements could not reasonably have given Reclamation the impression that CAWCD wanted to complete construction "at any cost." Their words do not evince a clear and unequivocal intent to waive the repayment ceiling provision. Neither can their words reasonably be interpreted as expressly or impliedly directing Reclamation to continue incurring construction costs over and above the repayment ceiling. The evidence soundly rebuts the Government's claims of waiver and estoppel.

In fact, the only evidence in support of the Government's waiver and estoppel arguments is Clark's testimony that he wanted Reclamation to continue with construction. However, there is no evidence that Reclamation officials were aware that Clark or anyone else on CAWCD's staff wanted construction to continue. His statements do not reveal that he wanted Reclamation to continue incurring reimbursable construction costs in excess of the repayment ceiling, or that he was authorized to take such a position. The rest of the evidence offered on this point is ambiguous and inconclusive.[21]

CAWCD's willingness to negotiate an amendatory contract in 1994–95 does not in any way change this conclusion. The United States argues that CAWCD waived the repayment ceiling provision by agreeing to negotiate a new ceiling. The Government also contends that CAWCD should be estopped from asserting the repayment ceiling provision in the 1988 Agreement, because the Government continued to incur construction costs during the 1994–95 negotiations based on the reasonable belief that the negotiations would produce a new ceiling.

The decision whether to stop or limit construction rested solely with Reclamation.

**20.** The United States has failed to explain why it did not contact CAP in 1991 to begin negotiating an amendment to the repayment agreement. Arguably, the quandary that the parties now find themselves in might have been prevented had the United States taken prompt action when it first learned that the ceiling would be exceeded.

**21.** For example, the Government cites CAWCD's actions on "Tin Cup Day," the Plan 6 Agreement, efforts to increase water deliveries, CAWCD's operational control over the project, and the 1994–95 negotiations as further examples of CAWCD's desire for Reclamation to keep building. In fact, several of these events occurred long before it became known that the repayment ceiling was going to be exceeded (*e.g.*, the Plan 6 Agreement was executed in 1986 and modified in 1987).

Reclamation chose not to exercise this option, but instead decided to continue with construction in the reasonable expectation that the parties would agree on an increased repayment ceiling. The United States knew, or should have known, that there existed the risk that the parties might not agree on a new repayment ceiling, in which case CAWCD's repayment obligation would be limited to the ceiling imposed in the 1988 Agreement. This is precisely what happened in this case: an amendatory agreement was never executed and the reimbursable construction costs exceeded the ceiling. In fact, a further negotiating sessions was not scheduled by Reclamation after June 9, 1995.

In the absence of an amendatory ceiling, CAWCD is only responsible for costs up to the $1.781 billion ceiling.

In short, the United States' affirmative defenses of waiver and estoppel fail for lack of evidence. CAWCD's actions from 1991 through the 1994–95 negotiations consistently demonstrated that it was relying on the repayment ceiling provisions of the 1988 Agreement. CAWCD continually reminded Reclamation of the repayment ceiling, inquired when it thought that costs were approaching the repayment ceiling, and on at least two occasions urged Reclamation not to exceed the ceiling in the absence of an amendatory contract. Accordingly, the Court concludes that the evidence does not sustain the Government's claims of waiver and/or estoppel.

## C. Unjust Enrichment and *Quantum Meruit*

The United States also argues that the doctrines of unjust enrichment and/or *quantum meruit* require CAWCD to repay *all* reimbursable construction costs to the United States, including those costs that exceed the repayment ceiling. Under these theories of recovery, the United States seeks to recover the full $2.33 billion in reimbursable costs that have been incurred to date.

 *Quantum meruit* (or quasi-contract) is an equitable remedy, implied by law, under which a plaintiff who has rendered services benefitting a defendant may recover the reasonable value of those services when neces-

sary to prevent the unjust enrichment of the defendant. *In re De Laurentiis Entertainment Group Inc.*, 963 F.2d 1269, 1273 (9th Cir.1992). "The purpose of *quantum meruit* is to prevent unjust enrichment at the expense of another." *Hahn v. Oregon Physicians' Serv.*, 786 F.2d 1353, 1355 (9th Cir. 1985) (quoting *Schroeder v. Schaefer*, 258 Or. 444, 483 P.2d 818, 820 (1971)).

 *Quantum meruit* is an appropriate remedy where the parties have attempted to contract but the contract is unenforceable or void. Unjust enrichment, by contrast, is properly asserted where there was never any attempt to arrive at a contract. *Interform Co. v. Mitchell*, 575 F.2d 1270, 1278 n. 4 (9th Cir.1978). The difference is minor and not especially relevant to this action. Recovery under both theories is premised on the absence of an express contract. *Newberry Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1405 (9th Cir.1996); *Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir.1996). "[R]ecovery in *quantum meruit* is not appropriate where there is a valid contract covering the subject matter of the dispute." *Hahn*, 786 F.2d at 1355.

 There is an express contract existing between the parties to this action that clearly establishes their rights and obligations. The 1988 Agreement limits CAWCD's repayment obligation and explicitly does not authorize the United States to recover construction costs over the repayment ceiling in the absence of an amendatory contract. The United States therefore has no basis to recover the excess reimbursable costs under either a quasi-contract or an unjust enrichment theory.

## D. Other Theories of Recovery

The United States also asserts a number of other claims in an attempt to recover construction costs above the $1.781 billion repayment ceiling. For example, the Government maintains that the 1988 Agreement's implied covenant of good faith and fair dealing requires CAWCD to increase the repayment ceiling in order to cover all reimbursable costs above the repayment ceiling;[22] that public health and safety consid-

---

**22.** This argument is merely a restatement of the

estoppel theory, which the Court has already

erations warranted the continuation of construction at CAWCD's expense; and that it would be inequitable to enforce any repayment ceiling against the United States under the facts of this case.

These claims are unpersuasive. The repayment ceiling provision was originally included in the 1972 Agreement to prevent the Government from having a blank check to spend on construction. According to Burr Sutter:

> During out last session in Washington, D.C., as I recall, it occurred to me that perhaps we should have a limit on the district's obligation, and so I proposed that to the Department of Interior, the Bureau of Reclamation, and I said, I don't feel I can go back to Phoenix with a contract that gives the government a blank check to spend whatever they want, and then we have to pay it. I said, you decide what a fair limit would be and propose it, and we'll see if we can go along with it.

(Sutter Dep. at 15).

This repayment ceiling provision carried over to the 1988 Agreement and appears in Article 9.3(e) and Exhibit B. The amended provision was intended to have the same purpose as the original provision—to ensure that the Government did not have a blank check for construction.

A blank check, however, would be the result if the United States' contentions were allowed. These remaining claims can be summarized as follows: regardless what the contract says, CAWCD is liable for all properly allocable construction costs expended by the United States. If true, this would render the 1988 Agreement's repayment ceiling illusory and meaningless.

The Court finds *United States v. Coachella Valley County Water Dist.*, 111 F.Supp. 172 (S.D.Ca.1953) to be particularly relevant to the issues at hand. In *Coachella Valley*, a water district entered into a repayment contract with Reclamation. Although the contract included a repayment ceiling of $13.5 million, Reclamation estimated a cost overrun of $2.7 million and sought to recover the difference from the water district. The question before the *Coachella Valley* court was whether the Government was entitled to collect actual construction costs, or whether recovery was limited to the $13.5 million repayment ceiling.

The *Coachella* court rejected the Government's claims that the water district was liable for costs above the ceiling. It ruled that:

> '. . . Legal obligations that exist but cannot be enforced are ghosts that are seen in the law but that are elusive to the grasp.'

> Certainly when the contract in question was signed by the irrigation district, the members were not grasping a ghost which could elusively slip through their fingers or change its character at the whim of a government official.

> A contract is a contract, regardless of whether it is made between individuals or between individual [sic] and a government agency; and if made with an agency, the latter should not have a right to change any terms of the duly executed and partially performed contract.

> From the foregoing, this court is of the opinion the government is restricted to the terms of its contract, which provides that under no circumstances shall the cost exceed $13,500,000.

*Id.* at 180 (quoting *The Western Maid*, 257 U.S. 419, 433, 42 S.Ct. 159, 66 L.Ed. 299 (1922)).

This Court concurs with the ruling in *Coachella Valley*. The right to recover reimbursable construction costs is expressly limited by contract, and nothing has been presented in this case that would justify permitting the United States to avoid its contractual obligations. Absent an amendatory contract that covers excess reimbursable construction costs, the United States' right to recover reimbursable costs is limited to the terms of the 1988 Agreement, which provides for a $1.781 billion repayment ceiling on reimbursable costs.

---

rejected. The United States is arguing that CAWCD induced Reclamation to continue with construction and created the expectation of re-

payment, in violation of the covenant of good faith and fair dealing. There is no evidence to support this claim.

## E. Article 6.7 and Related Issues

 Finally, the United States argues that Article 6.7 of the 1988 Agreement, as well as general principles of federal contract law, prohibit CAWCD from utilizing the CAP unless and until CAWCD executes a written agreement increasing its repayment obligation to cover all reimbursable costs.

Article 6.7 reads in part as follows:

If appropriations for the continuance and/or completion of construction in amounts sufficient in the opinion of the Secretary to complete said construction are authorized by Congress and are available, the Secretary shall consult with the Contractor and shall make continuation of construction contingent upon the execution of an amendatory contract with the Contractor wherein the Contractor's maximum repayment obligation is increased so as to cover the increased reimbursable costs as determined by the Secretary; *Provide, however,* That the contractor shall not utilize any part of the completed or unfinished project facilities in the absence of written agreement with the Secretary for reimbursement therefor.

The original appropriations ceiling for the CAP was $832,180,000 and was based on 1967 cost estimates. (Exhibit A, Art. 6.7; Exhibit B, Art. 6.7). This figure has been regularly adjusted to account for inflation and costs incurred to comply with general legislation, such as the National Environmental Policy Act or the Endangered Species Act. The present appropriations ceiling is approximately $3.1 billion and has not been exceeded.

Article 6.7 was originally drafted by Reclamation and carried over in its entirety from the 1972 Agreement and was not the subject of any discussion or modification during the 1988 negotiations. (Sutter Dep. at 34; Tr. 8/4/98 (Clark) at 75; Tr. 8/11/98 (Hvinden) at 625). Article 6.7 was intended to address a situation where the appropriations ceiling was exceeded. (Sutter Dep. At 37).

The Court concludes that Article 6.7 authorizes Reclamation to prevent CAWCD's use of CAP facilities under circumstances which are not present in this case. It applies only to situations where the Congressional appropriations ceiling has been exceeded and Con-

gress has authorized additional funds to cover the overage, but CAWCD's repayment obligation has not been increased to cover the additional reimbursable costs. (Exhibit B, Art. 6.7). In the event that an amendatory contract was not executed to cover the excess reimbursable costs, the Government could invoke Article 6.7 to bar CAWCD from using the CAP.

However, Article 6.7 was not intended to provide the United States with a remedy anytime reimbursable costs exceeded the repayment ceiling. (Sutter Dep. at 37). According to Burr Sutter, Article 6.7 did not apply to the repayment ceiling:

Q. Could [the Secretary] deprive the district from the use of the project?

A. It doesn't say that.

Q. What relation, if any, is there between Article 9.3(b) and Article 6.7, the one that we referred to before?

A. None so ever. None whatsoever, as I recall. Two entirely different provisions.

Q. What's 6.7 talk about, or refer to?

It talks about maximum amount. Doesn't that refer to the ceiling in 9.3?

A. No, I don't think it does. I think it refers to appropriations really.

Q. Article 6.1?

A. Yeah.

(Sutter Dep. at 37).

The CAP appropriations ceiling has not been exceeded. Consequently, the United States cannot invoke Article 6.7 to prevent CAWCD from using the CAP.

Federal contract law does not provide a basis for barring CAWCD from use of the CAP. The Government cites an opinion from the Armed Services Board of Contract Appeals, *Appeal of Flight Dynamics Research Corp.,* 88–3 BCA 20,861, ASBCA No. 35,248, ASBCA No. 35,755, 1988 WL 61569 (A.S.B.C.A. May 10, 1988), in support of this argument, apparently for the following proposition:

The general rule is that where the Government demands and obtains the fruits of Contractor's efforts under a cost reimbursement type contract knowing the contract to be in an overrun condition, the

Contractor is entitled to recover its costs in spite of the limitation provisions of the 'Limitation of Cost' clause.

*Id.*

The Court does not find this decision persuasive. First and foremost, the *Flight Dynamics* case is clearly distinguishable on its facts. Furthermore, it is contrary to the rule enunciated in *Coachella Valley* that contractual limits can be placed on the United States' recovery of reimbursable costs. *Coachella Valley*, 111 F.Supp. at 180. To permit the United States to avoid its bargained-for contractual obligations in this case would essentially "eviscerate the government's power to bind itself to contracts." *Madera Irrigation Dist. v. Hancock*, 985 F.2d 1397, 1401 (9th Cir .1993).

The Court concludes that neither federal contract law nor Article 6.7 of the 1988 Agreement permits the United States to deny CAWCD use of the CAP.[23]

### CONCLUSIONS OF LAW

This Court has made numerous legal rulings that are set forth above in this Order. The Court summarizes these rulings by making the following conclusions of law.

1. The court has subject matter jurisdiction over the claims and counterclaims in this phase under 28 U.S.C. §§ 1331, 1345, and 43 U.S.C. § 390uu.

2. The repayment ceiling provision of the 1988 Agreement is ambiguous as a matter of law insofar as it could reasonably be interpreted as establishing either a fixed or variable repayment ceiling for Stages One and Two. Article 9.3(e) shows the repayment ceiling as being fixed at $2.0 billion. Exhibit B, however, includes a repayment ceiling which makes adjustments depending upon whether the GRIC executes a water delivery contract with the Secretary of Interior. The conflict between Article 9.3(e) and Exhibit B creates an ambiguity in the 1988 Agreement.

3. Under the rule of *contra proferentem*, the ambiguity created by the conflicting provisions must be strictly construed against the United States, because it drafted both provisions. Applying this rule, the repayment ceiling in the 1988 Agreement is a variable

repayment ceiling that would adjust downward if the GRIC subsequently executed a water delivery contract with the Secretary of Interior.

4. The preponderance of extrinsic evidence offered at trial shows that CAWCD and the United States intended to create a variable repayment ceiling in the 1988 Agreement that would adjust downward if the GRIC subsequently executed a water delivery contract with the Secretary of Interior.

5. The repayment ceiling in the 1988 Agreement was $1.781 billion after the GRIC executed a water delivery contract on October 22, 1992. The adjustment in the repayment ceiling from $2.0 billion to $1.781 billion reflects the fact that 173,100 acre-feet of water allocated to GRIC was no longer within the repayment obligation of CAWCD.

6. The 1988 Agreement required the United States to cease construction if it determined that reimbursable construction costs would exceed the repayment ceiling. The United States breached the 1988 Agreement when it continued to incur construction costs in excess of the $1.781 billion repayment ceiling in the absence of an amendatory contract.

7. The United States' failure to cease construction once it became apparent that reimbursable construction costs were going to exceed the repayment ceiling does not entitle the United States to recover excess reimbursable costs from CAWCD.

8. The United States has failed to demonstrate by clear and convincing evidence that CAWCD waived the repayment ceiling provision, or should otherwise be estopped from asserting it in this action.

9. The United States' *quantum meruit* and unjust enrichment claims do not afford a basis for recovery of excess construction costs. *Quantum meruit* and unjust enrichment are implied-at-law contract theories which do not apply when there is an express contract.

10. The United States has failed to demonstrate that its breach of the repayment

---

**23.** In light of the Court's findings on this issue, it need not address CAWCD's bad faith claim, asserted as a defense to the Government's Article 6.7 argument.

ceiling provision was excused or that it is otherwise entitled to recover construction costs over the repayment ceiling unless an amendatory contract is executed.

11. Article 6.7 of the 1988 Agreement is unambiguous. However, it has no application to the present case, because there has been no claim asserted herein that the appropriations ceiling has been exceeded. The remedy set forth in Article 6.7 applies only to the appropriations ceiling, and is not relevant to a situation, such as the one in this case, where only the repayment ceiling has been exceeded. Accordingly, the United States is not entitled to bar CAWCD from using project facilities in the absence of an amendatory contract.

Based upon the above findings of fact and conclusions of law,

IT IS ORDERED that, as to the "repayment ceiling issues" in this action, CAWCD is hereby granted the following declaratory and injunctive relief against Defendants:

1. The Court declares that Article 9.3(e) and Exhibit B to the 1988 Agreement limits CAWCD's repayment obligation for Stages One and Two to $1.781 billion unless an amendatory contract is executed providing otherwise.

2. The Court declares that Defendants may not invoke Article 6.7 of the 1988 Agreement to prevent CAWCD from utilizing CAP facilities. Defendants are hereby enjoined from barring CAWCD from utilizing CAP facilities.

IT IS FURTHER ORDERED that the United States' counterclaims for declaratory relief as to "repayment ceiling issues" are denied.